Herbert **MARKMAN** and Positek, Inc., Plaintiffs–Appellants,

v.

**WESTVIEW INSTRUMENTS, INC.** and Althon Enterprises, Inc., Defendants–Appellees.

No. 92–1049.

United States Court of Appeals, Federal Circuit.

April 5, 1995.

---

William B. Mallin, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, argued for plaintiffs-appellants. With him on the brief were Lewis F. Gould, Jr., Timothy P. Ryan and Brian M. Martin.

Frank H. Griffin, III, Gollatz, Griffin, Ewing & McCarthy, Philadelphia, PA, argued for defendants-appellees. With him on the brief were Peter A. Vogt and Polly M. Shaffer.

Morton Amster, Anthony F. LoCicero, Joel E. Lutzker and David H. Kagan, Amster, Rothstein & Ebenstein, New York City, for amici curiae, Matsushita Elec. Corp. of America and Matsushita Elec. Indus. Co., Ltd.

Gregory A. Long and Kent R. Raygor, Sheppard, Mullin, Richter & Hampton, Los Angeles, CA, Charles Fried and Arthur R. Miller, Cambridge, MA, Donald Chisum, Morrison & Foerster, Seattle, WA and William Alsup, Morrison & Foerster, San Francisco, CA, for amicus curiae, Acuson Corp. and Honeywell, Inc.

R. Carl Moy, Asst. Professor, William Mitchell College of Law, Saint Paul, MN, for amicus curiae R. Carl Moy.

Sidney David, Charles P. Kennedy, William L. Mentlik and Roy H. Wepner, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for amici curiae, Ohmeda, Inc.

S. Leslie Misrock, Rory J. Radding, Steven I. Wallach, Pennie & Edmonds, New York City, for amicus curiae, Ad Hoc Committee to Promote Uniformity in the Patent System.

Gary L. Newtson, President, American Intellectual Property Law Ass., Roger W. Parkhurst, Parkhurst, Wendel & Rossi, of Alexandria, Harold C. Wegner, Wegner, Cantor, Mueller & Player, and Nancy J. Linck, Cushman, Darby & Cushman, Washington, DC

Roy E. Hofer, President, The Federal Circuit Bar Ass'n, Washington, DC, Anne E. Brookes, Honigman Miller Schwartz & Cohn, Houston, TX, and Robert J. Carlson, Christensen, O'Connor, Johnson & Kindness, of Seattle, WA, for amicus curiae, Federal Circuit Bar Ass'n.

Before ARCHER, Chief Judge,* and RICH, NIES, NEWMAN, MAYER, MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, and SCHALL, Circuit Judges.**

Opinion for the Court filed by Chief Judge ARCHER, in which Circuit Judges RICH, NIES, MICHEL, PLAGER, LOURIE, CLEVENGER, and SCHALL join. Concurring opinions filed by Circuit Judges MAYER, and RADER. Dissenting opinion filed by Circuit Judge NEWMAN.

ARCHER, Chief Judge.

Herbert Markman and Positek, Inc. (collectively referred to as Markman) appeal from the judgment of the United States District Court for the Eastern District of Pennsylvania, Civil Action No. 91–0940 (entered Oct. 1, 1991), that Westview Instruments, Inc. and Althon Enterprises, Inc. (collectively referred to as Westview) did not infringe claims 1 or 10 of United States Reissue Patent No. 33,054, notwithstanding the jury's verdict to the contrary. We have ordered that this case be reheard in banc.[1] We affirm the judgment of noninfringement. In doing so, we conclude that the interpretation and construction of patent claims, which define the scope of the patentee's rights under the patent, is a matter of law exclusively for

---

* Chief Judge Archer assumed the position of Chief Judge on March 18, 1994.

** Circuit Judge Bryson joined the Federal Circuit on October 7, 1994 and has not participated in the disposition of this appeal.

1. A panel of this court heard oral argument in the appeal. On November 5, 1993, this court ordered *sua sponte* that the appeal be reheard in banc. The court also requested additional briefing and has been helped by the supplemental briefs of the parties and by the several briefs *amicus curiae.*

the court. Thus, in this case the district court properly discharged its obligation to delineate the scope of the claim on motion for judgment as a matter of law when the jury had rendered a verdict that was incompatible with a proper claim construction.

## I.

A. In the dry-cleaning industry, articles of clothing typically are taken in from customers, recorded in some form, and then sorted according to criteria such as type of clothing and type of cleaning required. During the sorting process, articles of clothing belonging to one customer may be combined together, and also may be combined with similar clothing belonging to other customers, in order to make the cleaning process more efficient and less costly. After the articles of clothing are sorted, they may be cleaned in the same establishment or transported to another establishment for cleaning. During the cleaning process, the articles of clothing move through different locations in the establishment. After cleaning, of course, the articles of clothing must be unsorted and returned to the respective customers.

Markman is the inventor named in and the owner of United States Reissue Patent No. 33,054 (the '054 patent), titled "Inventory Control and Reporting System for Drycleaning Stores." Markman's original patent No. 4,550,246 was reissued and the reissue is the patent in suit. Positek is a licensee under the patent in the dry-cleaning business.

The '054 patent is directed to an inventory-control system that assertedly solves inventory-related problems prevalent in the dry-cleaning business. As the '054 patent specification discusses, articles of clothing can be lost in the sorting and cleaning process, and it has been found in the dry-cleaning business that even a small percentage-loss of articles of clothing will generate great consumer dissatisfaction. Also, attendant personnel might send clothing through the cleaning process but pocket the proceeds of the transactions and destroy or fail to do the appropriate paperwork, thereby servicing the customers adequately but stealing from the business. In such circumstances it is diffi-

cult for the business owner to locate the loss of profits and to deter such activities.

The invention of the '054 patent is described in detail in the specification which states that the inventory control system is "capable of monitoring and reporting upon the status, location and throughput of inventory in an establishment," and that by using the invention of the '054 patent, "the progress of articles through the laundry and dry-cleaning system can be completely monitored." In this way, the business owner can "reconcile[ ] [the inventory] at any point in the sequence" of sorting, cleaning, and unsorting clothing, and can "detect and localize spurious additions to inventory as well as spurious deletions therefrom."

According to the specification's description of the invention, as customers bring in their articles of clothing for cleaning, the articles are accumulated by an attendant. The attendant enters information on a keyboard identifying at least the particular customer, the type of articles being deposited, and the particular cleaning operations to be performed. Other information may be entered depending upon the complexity of the system.

A data processor stores and processes the data entered by the attendant, associating sequential customers and transactions with a unique indicium such as a number. The processor is connected to a printer that generates a written record of the stored information associated with the particular customers and transactions. No transaction can proceed without generating a written record, thereby ensuring that each transaction is accounted for.

The patent specification specifies that the written record is to have different portions. For example, the written record includes a customer ticket or receipt, a management ticket copy, and a plurality of article tags. The article tags are to be attached to individual articles or groups of articles in inventory. The management ticket and the article tags contain a bar code and a unique indicium such as a number associated with a customer, transaction, and other information. The bar code records are custom printed sequentially, as sequential customer transactions occur.

The tags thus not only associate a bar code with transactions, but also with an article or group of articles, persons, physical items in inventory, and other information again depending upon the system's complexity.

Optical detector devices are then used to read the bar code indicia, and they may be located at various points in the cleaning process, including at least at the customer service station. The articles are logged through a particular station by scanning the tags containing the bar codes with the detector. The bar codes are used to call up information associated with the customer or transaction, and used to generate reports containing information such as the location of articles within the system, the number of articles located at a particular point in the system, etc. Obviously, the more optical detectors, the tighter the inventory control. After the articles have been processed, optical detection of the bar codes can be used to reorganize the articles into customer packages. The overall result is that additions to and deletions from inventory can be located— wherever an optical detector appears—and can be associated with particular customers and articles of clothing. In this way the inventory can be fully reconciled.

In claim 1, the only independent claim involved in this appeal, Markman claims his invention to be (emphasis added):

1. The inventory control and reporting system, comprising:

a data input device for manual operation by an attendant, the input device having switch means operable to encode information relating to sequential transactions, each of the transactions having articles associated therewith, said information including transaction identity and *descriptions of each of said articles* associated with the transactions;

a data processor including memory operable to record said information and *means to maintain an inventory total,* said data processor having means to associate sequential transactions with unique sequential indicia and *to generate at least one report of said total* and said transactions, the unique sequential indicia and the descriptions of articles in the sequential

transactions being reconcilable against one another;

a dot matrix printer operable under control of the data processor to generate a written record of the indicia associated with sequential transactions, the written record including optically-detectable bar codes having a series of contrasting spaced bands, the bar codes being printed only in coincidence with each said transaction and at least part of the written record bearing a portion *to be attached to said articles;* and,

at least one optical scanner connected to the data processor and operable to detect said bar codes *on all articles* passing a predetermined station,

whereby said system can detect and *localize spurious additions to inventory* as well as spurious deletions therefrom.

In dependent claim 10, Markman specifies that in the invention of claim 1, the input device is an alpha-numeric keyboard wherein single keys may be used to enter attributes of items being entered.

B. Markman sued Westview and Althon for infringement of claims 1, 10, and 14 of the '054 patent. Westview makes and sells specialty electronic devices, including the system accused of being an infringement of the '054 patent. Althon owns and operates two dry-cleaning sites and uses Westview's device in one of its shops.

The accused Westview device consists of two separate pieces of equipment, which Westview calls the DATAMARK and the DATASCAN. The DATAMARK is a stationary unit comprising a keyboard, electronic display, processor, and printer. When a customer brings articles of clothing in for cleaning, an attendant enters on a keypad information about the customer, articles to be cleaned, and charges for the cleaning. The DATAMARK then prints a bar-coded ticket or invoice listing the information about the customer, the clothes to be cleaned, and the charges for the cleaning. The DATAMARK retains permanently in memory only the invoice number, date, and cash total. The DATAMARK is thus used to print bar-

coded tickets for the articles and to retain an invoice list.

The DATASCAN is a portable unit comprising a microprocessor and an optical detector for reading bar-coded tickets or invoices at any location in the dry-cleaning establishment. To use the DATASCAN, first the invoice list is transferred from the DATAMARK to the DATASCAN. Then, the DATASCAN is carried about to read the bar-codes on tickets or invoices in the establishment. As it does this, it can report any discrepancy between the particular invoice read (or not read) and the invoice list. In this way the DATASCAN identifies extra or missing *invoices*.

C. At a jury trial on the issue of infringement, Markman presented the testimony of four witnesses: (1) an expert on bar-code technology who testified about the manner in which Westview's device operates, (2) Markman, the inventor, who testified about his patent and its claims, (3) a "patent expert"—that is, a practicing patent lawyer—who testified in his capacity as a patent lawyer about the meaning of the claim language and how the claims allegedly read on the accused system, (4) an accountant who testified as to the number of allegedly infringing systems sold. Also included in evidence were the actual Westview device and its operating manuals, brochures, and computer program. At the conclusion of Markman's case in chief, Westview moved for a directed verdict.[2] The district court deferred ruling on the motion. Westview then presented the testimony of a single witness, its president, who demonstrated the operation of the Westview device and testified about its capabilities.

The district court charged the jury on infringement, instructing it to "determine the meaning of the claims ... using the relevant patent documents including the specifications, the drawings and the file histories." The court continued that "[a]lso relevant are other considerations that show how the terms of a claim would normally be understood by those of ordinary skill in the art." The court then instructed the jury to compare the claims with the Westview device to determine if it infringes. The jury returned answers to general interrogatories finding that Westview infringed independent claim 1 and dependent claim 10 but did not infringe independent claim 14.[3]

The district court then heard argument on and granted Westview's deferred motion for judgment as a matter of law (JMOL). Stating that claim construction was a matter of law for the court, the district court provided its construction of the claims. The court held that "inventory" as used in the claims meant "articles of clothing" and not simply transaction totals or dollars. Under the district court's construction, the claims require that the system be able to track articles of clothing through the dry-cleaning process, detect and localize missing and additional articles of clothing, and generate reports about the status and location of the articles of clothing. It is undisputed that Westview's system is incapable of doing this because it does not retain information regarding the particular articles of clothing, but rather only a listing of the invoices and the cash total of the inventory. Among other things, the court concluded that Westview's device does not have the "means to maintain an inventory total" required by claim 1, and cannot "detect and localize spurious additions to inventory as well as spurious deletions therefrom," and directed a verdict of noninfringement of claims 1 and 10.

## II.

A. Markman appealed from the district court's grant of JMOL of noninfringement of claims 1 and 10. In this court, Markman's principal argument is that the district court erred in granting the JMOL, stating:

> Requiring the jury to interpret certain terms of the patent was quite proper, and indeed required, as the meaning of certain terms of Claim 1 was contested at trial. *See Polumbo v. Don–Joy Co.* [*sic*], 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir. 1985) (when the meaning of a claim term is

---

**2.** "Directed verdict" has since been renamed "judgment as a matter of law" and is hereinafter referred to as such. *See* Fed.R.Civ.P. 50.

**3.** The finding of noninfringement of independent claim 14 is not at issue in this appeal.

disputed a "factual question arises, and construction of the claim should be left to the trier or jury under appropriate instruction.")

. . . .

Despite entrusting the jury with interpreting the claim, the trial court thwarted [Markman's] right to a jury determination of this factual issue simply because it disagreed with the jury's interpretation. At the root of the district court's astonishing opinion was its mistaken belief that it had a license to re-find the facts and reinterpret the claims as if there were no jury and no jury verdict because, in different appropriate cases, claims of a patent may be interpreted as a matter of law. . . .

. . . Indeed the deference due to a jury's claim construction was stated positively by this court in *Tol–O–Matic* [, *Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H.*, 945 F.2d 1546, 1550–52, 20 USPQ2d 1332, 1336–38 (Fed.Cir.1991).]

. . .

. . . .

. . . While in appropriate circumstances, claims may be interpreted as a matter of law by the court, in this case the jury was asked to and did interpret the patent as part of reaching its finding of infringement. Once the jury was assigned this task and rendered its verdict, the trial court was not permitted to discredit the verdict and substitute its evaluation of the evidence for the jury's.

In particular, Markman argues that the district court erroneously substituted its construction of the disputed claim term "inventory" for the jury's implied construction.

As the above quotation shows, Markman contends that the jury was properly given the question of claim construction and that the jury's claim construction and verdict thereon is supported by substantial evidence. The evidence Markman points to in support of the jury verdict is not the language of the patent specification or prosecution history, but rather Markman's own testimony as inventor and the testimony of his patent expert. He also relies on use of the word "inventory" in Westview's product literature and on the testimony of its president. Markman's position essentially is that all the evidence of the meaning of the word "inventory," from the patent, prosecution history, experts, and documents, was properly lumped together and submitted to the jury for it to resolve what in fact is the meaning of "inventory," and that the result of this process is entitled to highly deferential review both by the trial court on motion for JMOL and by this court on appeal from the grant or denial of JMOL.

Setting aside the issue of who properly determines the ultimate scope of the claims, Markman further argues that the district court misconstrued the term "inventory" to mean "articles of clothing" in addition to "cash" or "invoice totals" in order to find that claim 1 defines a system that "tracks" articles of clothing through the dry-cleaning process. Markman says that based on all the evidence presented at trial the term "inventory" as used in claim 1 means "articles of clothing" *or* "dollars" *or* "cash" *or* "invoices," and is not necessarily limited to a construction that always includes "articles of clothing."

Westview on the other hand focuses almost exclusively on the patent and prosecution history to inform the meaning of "inventory." It argues that the patent and prosecution history are in conflict with the testimony and other evidence relied on by Markman and therefore Markman's evidence should be disregarded by the court in favor of the meaning revealed by the patent. This task of assigning the meaning to "inventory," and the meaning assigned are, in the view of Westview, all legal matters for the court and subject to *de novo* review.

It is undisputed that when the claim term "inventory" is construed to mean "the physical articles of clothing" or to require "articles of clothing" as part of its meaning, the Westview system lacks "means to maintain an inventory total" and does not and cannot "detect and localize spurious additions to inventory as well as spurious deletions therefrom," as claim 1 would thus require.[4]

4. Markman makes much of the distinction between tracking "individual" articles of clothing

Markman's appeal therefore turns on (1) whether the district court acted properly by construing the term "inventory" as a matter of law notwithstanding a contrary construction given the term by some of Markman's witnesses and by the jury, and (2) regardless of whether the court or the jury determines the scope of the claims, whether the term "inventory" requires as part of its meaning "articles of clothing."

■ B. Where a party moves for JMOL in a case that has been tried to a jury, the district court

> must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when *the correct legal standard is applied.* If there is not, [the movant] was entitled to have the question removed from the jury and decided as a matter of law.

*Jamesbury Corp. v. Litton Indus. Prods., Inc.,* 756 F.2d 1556, 1560, 225 USPQ 253, 257 (Fed.Cir.1985) (emphasis added). On appeal, we review *de novo* the correctness of the district court's grant of JMOL by reapplying the JMOL standard. *Id; see Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 762, 9 USPQ2d 1417, 1421 (Fed.Cir.1988).

■ Embedded within the above description of JMOL are two aspects. Factual findings made by the jury in arriving at its verdict are to be upheld unless the party moving for JMOL shows that (when the correct legal standard is applied) there is not substantial evidence to support a finding in favor of the nonmovant. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992).

■ While the jury's factual findings receive substantial deference on motion for JMOL, the legal standards that the jury applies, expressly or implicitly, in reaching its verdict are considered by the district court and by the appellate court *de novo* to determine whether those standards are correct as a matter of law. *Baltimore & Carolina Line, Inc. v. Redman,* 295 U.S. 654, 660, 55 S.Ct. 890, 893, 79 L.Ed. 1636 (1935) ("[A] federal court may take a verdict subject to the opinion of the court on a question of law...."); *Read Corp.,* 970 F.2d at 821, 23 USPQ2d at 1431; *see Elder v. Holloway,* ——— U.S. ———, ———, 114 S.Ct. 1019, 1023, 127 L.Ed.2d 344 (1994) ("[Q]uestion[s] of law ... must be resolved *de novo* on appeal."); *Bradley v. Secretary of Health and Human Servs.,* 991 F.2d 1570, 1574 n. 3 (Fed.Cir. 1993) ("Legal conclusions are, of course, always reviewed *de novo.*"); *Heisig v. United States,* 719 F.2d 1153, 1158 (Fed.Cir.1983); *see also Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984) ("[A]n appellate court[ ] [has] power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law."). Notwithstanding the jury's verdict, on review of a motion for JMOL the court retains the power and duty to say what the correct law is, and then to examine the factual issues submitted to the jury and determine whether findings thereon are supported by substantial evidence and support the verdict under the law. *Read Corp.,* 970 F.2d at 821, 23 USPQ2d at 1431; *Senmed, Inc. v. Richard–Allan Medical Indus., Inc.,* 888 F.2d 815, 818, 12 USPQ2d 1508, 1511 (Fed.Cir. 1989); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1550, 220 USPQ 193, 200 (Fed.Cir. 1983).[5]

---

and tracking "batches" of clothing and says the district court erroneously restricted the invention to the former. For purposes of this appeal, this distinction is irrelevant because Westview's system tracks neither individual articles of clothing nor batches of clothing.

5. The general rule is that in reviewing the law on a properly laid and renewed motion for JMOL, the appellate court is not bound by the instructions given the jury, even if they were not objected to. *Boyle v. United Technologies, Corp.,* 487 U.S. 500, 513–14, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988) (unobjected to jury instructions are not law of the case for purposes of JMOL); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 120, 108 S.Ct. 915, 922, 99 L.Ed.2d 107 (1988); 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537, at 599–600 (1971). We therefore reject Markman's argument that we must defer to the jury's claim construction simply because the district court instructed the jury to interpret the claims and Westview did not object to this instruction. *See* Wright & Miller, *supra,* § 2521.

Since matters of law must be reviewed *de novo* and matters of fact must be accorded substantial deference, the review of a grant of JMOL requires careful distinction between fact and law. In this case which involves claim construction and a grant of JMOL of noninfringement based on claim construction, in order to determine whether that grant was correct, we must distinguish law from fact.

 C. An infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. *Read Corp.*, 970 F.2d at 821, 23 USPQ2d at 1431. The second step is comparing the properly construed claims to the device accused of infringing. *Id.* It is the first step, commonly known as claim construction or interpretation,[6] that is at issue in this appeal.

### III.

A. The opinions of this court have contained some inconsistent statements as to whether and to what extent claim construction is a legal or factual issue, or a mixed issue. Markman cites some of our cases which have statements that claim construction may be a factual or mixed issue, including *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.*, 945 F.2d 1546, 1550–52, 20 USPQ2d 1332, 1336–38 (Fed.Cir.1991), and *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir. 1985).

At its inception, the Federal Circuit held that claim construction was a matter of law. Our first opinion deciding a question of claim construction, *SSIH Equip. S.A. v. United States Int'l Trade Comm'n*, 718 F.2d 365, 376, 218 USPQ 678, 688 (Fed.Cir.1983) (originally reported at 713 F.2d 746–60), said so explicitly, resting on the authority of *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L.Ed.

717 (1853). Cases following *SSIH* include *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 770–71, 218 USPQ 781, 788 (Fed.Cir. 1983), *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569–71, 219 USPQ 1137, 1140–42 (Fed.Cir.1983), and *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1118–22, 1138–40, 227 USPQ 577, 583–86, 596–97 (Fed.Cir.1985) (in banc).

The first Federal Circuit case to deviate from this precedent and state that claim construction may have underlying factual inquiries that must be submitted to a jury was *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 221 USPQ 944 (Fed.Cir.1984). In *McGill*, the court stated that

> [i]f . . . the meaning of a term of art in the claims is disputed and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to a jury. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753 [221 USPQ 473] (Fed.Cir.1984); *cf. Hong Kong Export Credit Insurance Corp. v. Dun & Bradstreet*, 414 F.Supp. 153, 157 (S.D.N.Y.1975). In the latter instance, the jury cannot be directed to the disputed meaning for the term of art. *Cf. Butler v. Local Union 823, International Brotherhood of Teamsters*, 514 F.2d 442, 452 (8th Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 265, 46 L.Ed.2d 249 (1975).

*Id.* at 672, 221 USPQ at 948. A review of the authority relied on for this statement of law, however, is revealing. In contradistinction to the proposition for which it is cited, *Envirotech* in fact states "[t]he patented invention as indicated by the language of the claims must first be defined (*a question of law*), and then the trier must judge whether the claims cover the accused device (a question of fact)." *Id.* at 758, 221 USPQ at 477 (emphasis added). Thus *Envirotech* is entirely consistent with the earlier precedent.[7] The oth-

6. The dissenting opinion draws a distinction between claim interpretation and claim construction based on the distinction made in contract law. We do not make that distinction for, in our view, the terms mean one and the same thing in patent law. *See Senmed, Inc. v. Richard–Allan Medical Indus., Inc.*, 888 F.2d 815, 818, 12 USPQ2d 1508, 1511 (Fed.Cir.1989); *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1053, 12 USPQ2d 1474, 1476 (Fed.Cir.

1989). For consistency we use the term construction when referring to the first step in an infringement analysis.

7. The views of the "special concurrence" in *Envirotech*, contending that the claims on appeal had been properly submitted to the jury and were not reviewed *de novo* on appeal, were not adopted by the majority opinion. 730 F.2d at 763, 221 USPQ at 481 (Baldwin, J., specially

er two cases relied upon, the district court opinion in *Hong Kong Export Credit* and the Eighth Circuit opinion in *Butler,* are contract cases. Thus this court's earliest pronouncement of jury triable fact issues in claim construction cites no authoritative support.

Cases following the *McGill* view of claim construction provide no firmer basis for the view. Nevertheless, a significant line of cases has developed in our precedent stating (although rarely holding) that there may be jury triable fact issues in claim construction, relying on *McGill* (and its erroneous interpretation of *Envirotech*) and its progeny. *See Bio–Rad Labs, Inc. v. Nicolet Instrument Corp.,* 739 F.2d 604, 614, 222 USPQ 654, 661 (Fed.Cir.1984) (relying on *Envirotech*); *Palumbo v. Don–Joy Co.,* 762 F.2d 969, 974, 226 USPQ 5, 8 (Fed.Cir.1985) (no authority cited);[8] *Moeller v. Ionetics, Inc.,* 794 F.2d 653, 657, 229 USPQ 992, 995 (Fed. Cir.1986) (citing *Palumbo*); *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 389, 2 USPQ2d 1926, 1929 (Fed.Cir.1987) (citing *Moeller* and *Palumbo*); *Perini America, Inc. v. Paper Converting Machine Co.,* 832 F.2d 581, 584, 4 USPQ2d 1621, 1624 (Fed.Cir.1987) (citing *Palumbo* and *McGill*). The language from these opinions, to the effect that disputes over the meaning of claim language may raise factual questions reviewed for substantial evidence or clear error, as the case may be, continued to propagate through our precedent. This line of cases culminated in *Tol–O–Matic, Inc. v. Proma Produkt–Und Mktg. Gesellschaft m.b.H.,* 945 F.2d 1546, 20 USPQ2d 1332 (Fed.Cir.1991), in which this court affirmed a denial of a motion for judgment n.o.v., reasoning that

> [i]nterpretation of the claim words [at issue] required that the jury give consideration and weight to several underlying factual questions, including in this case the description of the claimed element in the specification, the intended meaning and usage of the claim terms by the patentee,

what transpired during the prosecution of the patent application, and the technological evidence offered by the expert witnesses.

*Id.* at 1550, 20 USPQ2d at 1336.

On the other hand, a second line of Federal Circuit opinions has continued to follow the earlier pronouncements that claim construction is strictly a question of law for the court. *See Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 986, 6 USPQ2d 1601, 1604 (Fed.Cir.1988); *Senmed,* 888 F.2d at 818–20, 12 USPQ2d at 1511–13; *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561–63, 19 USPQ2d 1500, 1503–04 (Fed.Cir.1991); *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387–88, 21 USPQ2d 1383, 1386–87 (Fed.Cir.1992); *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 822–23, 23 USPQ2d 1426, 1432–33 (Fed.Cir.1992).

**B.** Notwithstanding the apparent inconsistencies in our opinions, the Supreme Court has repeatedly held that the construction of a patent claim is a matter of law exclusively for the court. *Hogg v. Emerson,* 47 U.S. (6 How.) 437, 484, 12 L.Ed. 505 (1848); *Silsby v. Foote,* 55 U.S. (14 How.) 218, 225, 14 L.Ed. 391 (1853); *Winans v. Denmead,* 56 U.S. (15 How.) at 338; *Winans v. New York & Erie R.R. Co.,* 62 U.S. (21 How.) 88, 100, 16 L.Ed. 68 (1859); *Bischoff v. Wethered,* 76 U.S. (9 Wall.) 812, 816, 19 L.Ed. 829 (1870); *Heald v. Rice,* 104 U.S. 737, 749, 26 L.Ed. 910 (1882); *Coupe v. Royer,* 155 U.S. 565, 579–80, 15 S.Ct. 199, 205, 39 L.Ed. 263 (1895); *Market St. Cable Ry. Co. v. Rowley,* 155 U.S. 621, 625, 15 S.Ct. 224, 226, 39 L.Ed. 284 (1895); *Singer Mfg. Co. v. Cramer,* 192 U.S. 265, 275, 24 S.Ct. 291, 295, 48 L.Ed. 437 (1904); *see also* 2 William C. Robinson, *The Law of Patents for Useful Inventions* § 731, at 481 (1890) (hereinafter Robinson on Patents); George T. Curtis, *A Treatise on the Law of Patents for Useful Inventions* § 222, at 251 (4th ed. 1873) (hereinafter *Curtis on Pat-*

concurring). Accordingly, the concurrence's "spin" on the case is not the position of the court.

**8.** *Palumbo* also presented the issue of construction of means-plus-function claim limitations un-

der 35 U.S.C. § 112, para. 6. As that issue is not before us today, we express no opinion on the issue of whether a determination of equivalents under § 112, para. 6 is a question of law or fact.

*ents*).[9] Time and again the Supreme Court has itself resolved disputes over the construction of claims as a matter of law. *See, e.g., Coupe v. Royer,* 155 U.S. at 574–75, 579, 15 S.Ct. at 203, 205 (stating that court defines the scope of the claims and reversing the trial judge's erroneous claim construction); *Keystone Bridge Co. v. Phoenix Iron Co.,* 95 U.S. 274, 275, 24 L.Ed. 344 (1877) (resolving claim construction contentions on the basis of an exhaustive review of the patent and its discussion of the relevant art).

The reason that the courts construe patent claims as a matter of law and should not give such task to the jury as a factual matter is straightforward: It has long been and continues to be a fundamental principle of American law that "the construction of a written evidence is exclusively with the court." *Levy v. Gadsby,* 7 U.S. (3 Cranch) 180, 186, 2 L.Ed. 404 (1805) (Marshall, C.J.); *Eddy v. Prudence Bonds Corp.,* 165 F.2d 157, 163 (2d Cir.1947) (Learned Hand, J.) ("[A]ppellate courts have untrammelled power to interpret written documents."); 4 Samuel Williston, *Williston on Contracts* § 601, at 303 (3d ed. 1961) (hereinafter *Williston on Contracts*) ("Upon countless occasions, the courts have declared it to be the responsibility of the judge to interpret and construe written instruments, whatever their nature.") (footnotes omitted).

The patent is a fully integrated written instrument. By statute, the patent must provide a written description of the invention that will enable one of ordinary skill in the art to make and use it. 35 U.S.C. § 112, para. 1. Section 112, para. 2, also requires the applicant for a patent to conclude the specification with claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." It follows, therefore, from the general rule applicable to written instruments that a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law. *Bates v. Coe,* 98 U.S. at 38 ("[T]he claims of the patent, like other provisions in writing, must be reasonably construed...."); *Merrill v. Yeomans,* 94 U.S. 568, 571, 24 L.Ed. 235 (1877) (construing the patent in part by applying "well-settled rules of construing all instruments"); *accord Doble Eng'g Co. v. Leeds & Northrup Co.,* 134 F.2d 78, 83, 56 USPQ 426, 432 (1st Cir.1943) ("It appears to be firmly established that ... a patent is subject to the same general rules of construction as any other written instrument."); 2 *Robinson on Patents, supra,* § 732, at 481–82; 1 Anthony W. Deller, *Patent Claims* § 21 (2d ed. 1971).

There is much wisdom to the rule that the construction of a patent should be a legal matter for a court. A patent is a government grant of rights to the patentee. 35 U.S.C. § 154. By this grant, the patentee owns the rights for a limited time to exclude others from making, using, or selling the invention as claimed. *Id.; see Bloomer v. McQuewan,* 55 U.S. (14 How.) 539, 548, 14 L.Ed. 532 (1852). Infringement of the patentee's right to exclude carries with it the potential for serious consequences: The infringer may be enjoined and required to pay increased damages, costs and attorney fees. *See* 35 U.S.C. §§ 283–285. When a court construes the claims of the patent, it "is as if the construction fixed by the court had been incorporated in the specification," *Curtis on Patents, supra,* § 452, at 609, and in this way the court is defining the federal legal rights created by the patent document.

Further, it is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude. *Merrill v. Yeomans,* 94 U.S. at 573–74 ("It seems to us that nothing can be more just and fair, both to the patentee and to the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."); *Hogg v. Emerson,* 47 U.S. (6 How.) at 484. They may understand what is the scope of the patent

---

**9.** The Supreme Court has also in equity cases considered the scope of a patent to be a matter of law, not subject to deferential review. *See Seymour v. Osborne,* 78 U.S. (11 Wall.) 516, 546, 20 L.Ed. 33 (1871); *Bates v. Coe,* 98 U.S. 31, 38–39,

25 L.Ed. 68 (1879); *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 224, 26 L.Ed. 149 (1880); *Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 134, 62 S.Ct. 513, 517, 86 L.Ed. 736, 52 USPQ 275, 279 (1942).

owner's rights by obtaining the patent and prosecution history—"the undisputed public record," *Senmed,* 888 F.2d at 819 n. 8, 12 USPQ2d at 1512 n. 8—and applying established rules of construction to the language of the patent claim in the context of the patent. Moreover, competitors should be able to rest assured, if infringement litigation occurs, that a judge, trained in the law, will similarly analyze the text of the patent and its associated public record and apply the established rules of construction, and in that way arrive at the true and consistent scope of the patent owner's rights to be given legal effect.

Arriving at a true and consistent scope of the claims also works to the benefit of the patentee, as Professor Robinson eloquently observed:

> To treat the nature of the patented invention as a matter of fact, to be inquired of and determined by a jury, would at once deprive the inventor of the opportunity to obtain a permanent and universal definition of his rights under the patent, and in each case of infringement it would subject him to the danger of false interpretation, from the consequences of which he could not escape. By confiding this duty to the court, however, its decision as to the nature of the patented invention becomes reviewable to the same extent as any other legal question, and when his patent has received the interpretation of the Supreme Court of the United States the inventor can maintain his privilege, as thus interpreted, against all opponents without further controversy in reference to its true limitations.

2 *Robinson on Patents, supra,* § 733, at 483–84.

■ We therefore settle inconsistencies in our precedent and hold that in a case tried to a jury, the court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim. As such, "[a] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims." 3 *Robinson on Patents, supra,* § 1019, at 247. Because claim construction is a matter of law, the construction given the

claims is reviewed *de novo* on appeal. Accordingly, Markman's principal argument that the district court erred in taking the issue of claim construction away from the jury is itself legally erroneous.

## IV.

A. Markman argues that the jury's implied construction of the claims is correct and that the district court's construction of the claims is wrong, thereby necessitating that this court reinstate the jury's verdict. Markman contends that the jury properly considered all the evidence of record on the disputed claim term "inventory" in reaching its implicit conclusion that the term does not require articles of clothing. We find that these arguments are not convincing and we reach a conclusion that is in accord with the district court's construction of the claims.

"To ascertain the meaning of claims, we consider three sources: The claims, the specification, and the prosecution history." *Unique Concepts, Inc. v. Brown,* 939 F.2d 1558, 1561 (Fed.Cir.1991); *accord Autogiro Co. of Am. v. United States,* 384 F.2d 391, 396–98, 181 Ct.Cl. 55, 155 USPQ 697, 701–03 (1967). "Expert testimony, including evidence of how those skilled in the art would interpret the claims, may also be used." *Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 631 (Fed.Cir.1987). In construing the claims in this case, all these sources, as well as extrinsic evidence in the form of Westview's sales literature, were included in the record of the trial court proceedings.

■ Claims must be read in view of the specification, of which they are a part. *Autogiro,* 384 F.2d at 397, 155 USPQ at 702; *see Winans v. Denmead,* 56 U.S. (15 How.) at 338; *Bates v. Coe,* 98 U.S. at 38–39. The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *See In re Vogel,* 422 F.2d 438, 441, 164 USPQ 619, 621 (CCPA 1970) ("Occasionally the disclosure will serve as a dictionary for terms appearing

in the claims, and in such instances the disclosure may be used in interpreting the coverage of the claim."). As we have often stated, a patentee is free to be his own lexicographer. *Autogiro*, 384 F.2d at 397, 155 USPQ at 702. The caveat is that any special definition given to a word must be clearly defined in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388, 21 USPQ2d 1383, 1386 (Fed.Cir. 1992). The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.

To construe claim language, the court should also consider the patent's prosecution history, if it is in evidence. *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545, 148 USPQ 459, 473 (1966). This "undisputed public record" of proceedings in the Patent and Trademark Office is of primary significance in understanding the claims. *See Autogiro*, 384 F.2d at 397, 155 USPQ at 702 (the "file wrapper" is "part[ ] of the patent"). The court has broad power to look as a matter of law to the prosecution history of the patent in order to ascertain the true meaning of language used in the patent claims:

> Th[e] construction of the patent is confirmed by the avowed understanding of the patentee, expressed by him, or on his half [sic], when his application for the original patent was pending.... [W]hen a patent bears on its face a particular construction, inasmuch as the specification and claim are in the words of the patentee, ... such a construction may be confirmed by what the patentee said when he was making his application.

10. *Accord SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1120, 227 USPQ 577, 585 (Fed.Cir. 1985) (in banc) ("the district court's construction of the claims in light of the prosecution history [is] a question of law"); *Lemelson v. United States*, 752 F.2d 1538, 1550, 1552, 224 USPQ 526, 533 (Fed.Cir.1985) ("The prosecution histories being admitted into evidence, the court should have considered them in its construction of the claims."); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270, 229 USPQ 805, 811 (Fed.Cir.1986) ("[T]he prosecution history can and should, where relevant, be assessed

*Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 227, 26 L.Ed. 149 (1880); *see Singer Mfg. Co.*, 192 U.S. at 278–85, 24 S.Ct. at 296–99 (construing the claims in light of the prosecution history as a matter of law).[10] Although the prosecution history can and should be used to understand the language used in the claims, it too cannot "enlarge, diminish, or vary" the limitations in the claims. *Goodyear Dental Vulcanite Co.*, 102 U.S. at 227; *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1054, 12 USPQ2d 1474, 1477 (Fed.Cir.1989).

Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. This evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history. Extrinsic evidence may demonstrate the state of the prior art at the time of the invention. It is useful "to show what was then old, to distinguish what was new, and to aid the court in the construction of the patent." *Brown v. Piper*, 91 U.S. 37, 41, 23 L.Ed. 200 (1875).

The court may, in its discretion, receive extrinsic evidence in order "to aid the court in coming to a correct conclusion" as to the "true meaning of the language employed" in the patent. *Seymour v. Osborne*, 78 U.S. (11 Wall.) 516, 546, 20 L.Ed. 33 (1871) (reviewing a decree in equity); *see United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 233, 63 S.Ct. 165, 168, 87 L.Ed. 232, 55 USPQ 381, 384 (1942) (the court construed the claim by relying in part on the testimony of one of the patentees as the "clearest exposition of the significance which the terms employed in the claims had for those skilled in the art");

(along with, e.g., claim language and specification) in properly interpreting claim language."); *Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1283, 230 USPQ 45, 47 (Fed.Cir.1986) ("in view of the prosecution history the district court correctly interpreted the literal meaning of" the claim language at issue); 6 Ernest B. Lipscomb III, *Walker on Patents* § 21:1, at 261 (3d ed. 1987) ("The words of a patent or patent application, like the words of specific claims therein, always raise a question of law for the court....").

*U.S. Indus. Chems., Inc. v. Carbide & Carbon Chems. Corp.,* 315 U.S. 668, 678, 62 S.Ct. 839, 844, 86 L.Ed. 1105, 53 USPQ 6, 10 (1942) ("[I]t is permissible, and often necessary, to receive expert evidence to ascertain the meaning of a technical or scientific term or term of art so that the court may be aided in understanding ... what [the instruments] actually say."); *Winans v. New York & Erie R.R. Co.,* 62 U.S. (21 How.) at 101 ("[P]rofessors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing. A judge may obtain information from them, if he desire it, on matters which he does not clearly comprehend, but cannot be compelled to receive their opinions as matter of evidence."); *Marsh v. Quick–Meal Stove Co.,* 51 F. 203 (C.C.D.Mo.1892) ("It is the province of the court to construe the claims of the patent that has been offered in evidence. That construction, of course, is to be made in the light of such expert testimony as has been offered."); 3 *Robinson on Patents, supra,* §§ 1012–15, 1019–20; *accord Seattle Box Co. v. Industrial Crating & Packing, Inc.,* 731 F.2d 818, 826, 221 USPQ 568, 573 (Fed.Cir.1984) ("A trial judge has sole discretion to decide whether or not he needs, or even just desires, an expert's assistance to understand a patent. We will not disturb that discretionary decision except in the clearest case."); *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.,* 887 F.2d 1070, 1076, 12 USPQ2d 1539, 1544 (Fed.Cir. 1989) (Newman, J., dissenting) ("The purpose of expert testimony is to provide *assistance to the court* in understanding, when the claims are technologically complex or linguistically obscure, how a technician in the field, reading the patent, would understand the claims.") (emphasis added).

▮▮▮▮ Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims. *U.S. Indus. Chems., Inc.,* 315 U.S. at 678, 62 S.Ct. at 844, 53 USPQ at 10; *Catalin Corp. of Am. v. Catalazuli Mfg. Co.,* 79 F.2d 593, 594, 27

USPQ 371, 373 (2d Cir.1935) (Learned Hand, J.) ("If the doctrine of the 'integration' of a written instrument has any basis at all, surely it should apply to such a document ... [as the patent]."); 3 *Robinson on Patents, supra,* § 1019, at 247–48. When, after considering the extrinsic evidence, the court finally arrives at an understanding of the language as used in the patent and prosecution history, the court must then pronounce as a matter of law the meaning of that language. *See Loom Co. v. Higgins,* 105 U.S. 580, 586, 26 L.Ed. 1177 (1881). This ordinarily can be accomplished by the court in framing its charge to the jury, but may also be done in the context of dispositive motions such as those seeking judgment as a matter of law.

Through this process of construing claims by, among other things, using certain extrinsic evidence that the court finds helpful and rejecting other evidence as unhelpful, and resolving disputes *en route* to pronouncing the meaning of claim language as a matter of law based on the patent documents themselves, the court is *not* crediting certain evidence over other evidence or making factual evidentiary findings. Rather, the court is looking to the extrinsic evidence to assist in its construction of the written document, a task it is required to perform.[11] The district court's claim construction, enlightened by such extrinsic evidence as may be helpful, is still based upon the patent and prosecution history. It is therefore still construction, and is a matter of law subject to *de novo* review.

▮▮▮▮ B. Applying this analysis of claim construction, we conclude that (1) the trial court did not abuse its discretion when it admitted the extrinsic evidence offered by Markman—Markman's testimony and the testimony of Markman's "patent expert"—on the issue of claim construction, and that (2) the trial court properly rejected this extrinsic evidence to the extent it contradicted the court's construction of the claims based on the specification and prosecution history. Although in this case the trial court might have granted Westview's motion for directed verdict and should have instructed the jury

11. For an example of very thorough appellate review of claim construction based on the patent in view of extrinsic evidence, see *Mitchell v.*

*Tilghman,* 86 U.S. (19 Wall.) 287, 379–90, 22 L.Ed. 125 (1874).

as to the meaning of the claims (including the disputed term "inventory"), its failure to do so was rendered harmless by the court's subsequent response to Westview's post-trial motion.

We agree with the trial court that the term "inventory" refers, at least in part, to articles of clothing, contrary to Markman's contention that "inventory" may be limited to just cash or inventory receipts. As the district court noted, the claim phrase "detect and localize spurious additions to inventory as well as spurious deletions therefrom" does not make sense using Markman's definition of "inventory." Dollars or invoice totals are not "localized" since dollars do not travel through the cleaning process and the location of invoices is irrelevant. Location is relevant to clothing, since it moves through and sometimes without the establishment, where it can be lost, stolen, or damaged. Also, "spurious" additions and deletions logically relate to clothing because "dollars" would not be spuriously added to a dry-cleaner's inventory. Thus, the language of the claim itself suggests the conclusion that the dry-cleaner's "inventory" includes clothing.

The patent specification confirms this. The specification is pervasive in using the term "inventory" to consist of "articles of clothing." Rather than set forth each instance, we refer the reader to a few examples:

> This invention relates to inventory control devices capable of monitoring and reporting upon the status, location and throughput of inventory in an establishment. [Col. 1, lines 12–17.]

> The best inventory control and management reporting information systems has [sic] the ability to determine and report the current location of any given article [12] in inventory. [Col. 5, lines 14–17.]

> Every transaction is recorded, including identification of the articles placed in inventory. [Col. 5, lines 8–10.]

> [I]ncoming articles to be placed in inventory are accumulated over a counter.... [Col. 6, lines 7–8.]

> [A]rticles to be cleaned are associated with a unique bar code indicia for later automatic or semiautomatic optical scanning and data input, whereby the progress of articles through the laundry and drycleaning systems can be completely monitored. [Col. 2, lines 53–57.]

The prosecution history is also in accord. During prosecution of the original patent application in this case, Markman amended claim 1 in order to overcome an obviousness rejection by adding limitations reciting among other things "whereby said system can detect and localize spurious additions to inventory as well as spurious deletions therefrom." Markman argued in his remarks to the examiner that

> unlike the usual system in which apparatus generates non-unique indicia (e.g., Stewart's price indicia) and/or indicia that is [sic] not produced concurrently with the commencement of a transaction (e.g., preprinted tags), applicant's system is operable to keep a running reconcilable inventory total by adding input articles and subtracting output articles, *and also* protects against the possibility of undocumented or spuriously-documented articles entering the system. [Emphasis in original.]

Markman also referred the examiner to "features present" in claim 1, explaining:

> Means are also provided for reconciling the very same unique and concurrently-generated indicia at later points during processing whereby the entry or exit of inventory articles in irregular ways can be localized.

Also, the prosecution history of the patent on reissue conflicts with Markman's argument now that claim 1 does not require "tracking" of articles of clothing. In order to obtain other claims in the reissue patent broader than claim 1, which was carried through to the reissue patent, Markman explained the scope of the original claims thusly:

> 1. *Tracking of Individual Articles*
>
> It may be argued that the claims are limited to a system that tracks individual articles such as individual pieces of clothing brought by a single consumer to a

---

12. It is undisputed that "article" means "article of clothing."

drycleaning establishment or the like. I believe that tracking of a transaction whether it involves one article or several is properly disclosed and allowable. The claim language recites entry of "descriptions of each of said articles associated with the transactions". This passage is more limited than I had a right to claim because, although individual articles, e.g. a pair of pants, could be accounted for by individual marking, scanning and reconciliation in reports, the grouping of such articles into sets for tracking (e.g., a suit comprising pants under jacket and/or a suit and a Dress or other spearable [sic] articles grouped together) is reasonably disclosed as forming part of the invention and is allowable over the prior art.

It is evident from Markman's explanation of the claims to the examiner that he used "inventory" in the patent and the examiner understood "inventory" to consist of "articles of clothing." The prosecution history thus confirms the meaning of "inventory" as including "articles of clothing."

Markman argues that the extrinsic evidence of record provides substantial evidence in support of the jury's and his claim construction. Markman testified as an inventor of the patent in suit and as one of ordinary skill in the art (or, perhaps more accurately, one of "extraordinary" skill in the art) that "inventory" did not need to include articles of clothing. Markman's "patent expert" testified likewise, when giving his opinion on the proper construction of the claims. Finally, Markman argues that the testimony of Westview's president and some of its sales literature also support such claim construction. We do not find Markman's arguments persuasive.

■ First, the testimony of Markman and his patent attorney on the proper construction of the claims is entitled to no deference. For example, they both testified as to how the patent should be construed based on the text of the patent. This testimony about construction, however, amounts to no more than legal opinion—it is precisely the process of construction that the court must undertake. Thus, as to these types of opinions, the court has complete discretion to adopt the expert legal opinion as its own, to find guidance from it, or to ignore it entirely, or even to exclude it. *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 797, 17 USPQ2d 1097, 1100 (Fed.Cir.1990). When legal "experts" offer their conflicting views of how the patent should be construed, or where the legal expert's view of how the patent should be construed conflicts with the patent document itself, such conflict does not create a question of fact nor can the expert opinion bind the court or relieve the court of its obligation to construe the claims according to the tenor of the patent. This opinion testimony also does not change or affect the *de novo* appellate review standard for ascertaining the meaning of the claim language. Thus, to the extent they were testifying about construction itself, we reject Markman's and Markman's patent expert's testimony as having any controlling effect on what the court below and we perceive to be the meaning of "inventory" as used in the patent and prosecution history.

■ Second, the extrinsic evidence of record cannot be relied on to change the meaning of the claims. In this case, as fully discussed above, the patent and prosecution history make clear that "inventory" in claim 1 includes in its meaning "articles of clothing." The district court exercised its discretion in finding unhelpful Markman's testimony that he meant "inventory," or that one of ordinary skill in the art would understand "inventory," to mean something to the contrary, and furthermore the district court rejected the testimony as conflicting with the meaning derived from the patent and prosecution history. In our construction of the claim term "inventory," we too find unhelpful and reject Markman's testimony. Similarly, even if they in fact used "inventory" to mean other than articles of clothing, Westview's sales literature and the testimony of its president do not dissuade us from our legal construction of the claim, based on the patent and prosecution history, that the claim term "inventory" means articles of clothing.

V.

■ A. This decision that claim construction is properly viewed solely as a ques-

tion of law is consistent with precedent of the Supreme Court and much of this court's precedent. Yet the dissenting and one of the concurring opinions assert that our decision violates the Seventh Amendment. A close analysis of the bases underlying their arguments reveals, however, that they are unsupported by logic and precedent.

The Seventh Amendment provides "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. Const. amend. VII. Thus, if an action could be tried to a jury in 1791, the right to a jury trial is preserved. The Seventh Amendment has also been judicially interpreted as extending the right to jury trial to statutory causes of action analogous to common law actions. *Tull v. United States*, 481 U.S. 412, 417, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987).

The dissenting and one of the concurring opinions express in somewhat different ways why they believe our holding deprives plaintiffs of the constitutional right to a jury trial in patent infringement cases. The dissenting opinion argues there are jury triable factual inquiries involved in determining the scope of a claim and this determination is part of and often dispositive of patent infringement questions. One concurring opinion, which apparently acknowledges that sometimes claim construction is a legal question for the court, nonetheless finds a majority effort to indirectly create a "complexity exception" to the right to jury trial in patent infringement cases that will allow a three judge panel of this court to "do pretty much what it wants under its de novo retrial."

These arguments do not ring true. In this opinion we do not deprive parties of their right to a jury trial in patent infringement cases. Our opinion merely holds that part of the infringement inquiry, construing and determining the scope of the claims in a patent, is strictly a legal question for the court.[13] The patentee's right to a jury trial on the

application of the properly construed claim to the accused device is preserved as it was in 1791.

Any constitutional concerns raised by this opinion must be limited to the issue of claim construction. It is significant that neither the dissenting nor the concurring opinions cite any cases supporting the proposition that claim construction was a question of fact or involved triable issues of fact to a jury in or prior to 1791. None of the briefs of the parties or amici cite such a case, nor have we found any. The search for such a case may well be a fruitless one because of the manifest differences in patent law in eighteenth century England and patent law as it exists today in Title 35 of the United States Code. *See Hogg*, 47 U.S. (6 How.) at 479–83 (citing the significant differences between English law and United States law and cautioning against reliance on the former when applying the latter); Emerson Stringham, *Outline of Patent Law* § 5000, at 266–67 (1937) ("The patent claim, *first developed in the United States*, is now largely relied upon as defining the scope of protections....") (emphasis added). *See generally*, P.J. Federico, *Origin and Early History of Patents*, 11 J.Pat.Off. Soc'y 292 (1929).

■ B. The dissenting and one of the concurring opinions attempt to make the case that construing claims is analogous to construing and interpreting contracts, deeds, and wills. Traditionally courts have treated the construction of these documents as being a legal question for the court, but have stated that under certain circumstances the interpretation of an agreement may raise jury triable questions. Thus, by analogy, the argument is made that although claim construction may indeed be a question of law for the court, it also involves (or, in the argument of the concurrence, may involve) triable issues of fact.

The analogy of a patent to a contract may appear to some extent to be an appropriate

---

**13.** Our opinion also holds that we review district court determinations on questions of claim construction under a *de novo* standard of review, like other legal questions. In this regard, we emphasize that we are reiterating the long-recognized appellate review standard for issues of law in the trial proceeding, regardless of whether the case was tried to a judge or a jury. Contrary to the contentions of the dissenting opinion, this does not "effect[] a dramatic realignment of jury, judge, and the appellate process."

way of describing the circumstances surrounding the issuance of a patent.[14] The inventor is required to make full disclosure of his invention to the Patent and Trademark Office (PTO) and to the public in his patent specification, which he is otherwise not obligated to do. In return, the law allows the government to confer a property right to exclude anyone else from making, using, or selling the invention covered by the claims for seventeen years, which it is otherwise not obligated to do.

The analogy of a patent to a contract is not useful, however, in the context of a patent infringement suit. Patents are not contracts per se and patent infringement actions have never been viewed as breach of contract actions. Patent infringement has often been described as a tort. In a patent infringement suit, the inventor sues a competitor for infringing upon his right to exclude. The competitor is never a party to the so-called "contract" between the government and the inventor. *See Keystone,* 95 U.S. at 279 ("As patents are procured *ex parte,* the public is not bound by them, but the patentees are."). Nor does the competitor ever breach this contract between the government and the inventor by making, using, or selling the accused devices.

Questions of fact may arise in construing contracts, deeds, or wills in two contexts: First, the document may not reflect the agreement between, or the intent of, the two parties. Thus, unless the document is fully integrated and the parol evidence rule (or its equivalent in the other areas of law) applies, extrinsic evidence may be offered to demonstrate different or additional terms. There is no parol evidence rule in patent law for obvious reasons. It is axiomatic that the invention protected by the patent must be covered by the claims, otherwise it is lost.

*Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917). Parol or other extrinsic evidence cannot add, subtract, or vary the limitations of the claims.

A question of fact may also arise in construing contracts, deeds, or wills when there is an ambiguous term. In this situation, the parol evidence rule does not apply and extrinsic evidence may be offered to demonstrate what the parties intended when they used the term. Thus the factual inquiry for the jury in these cases focuses on the subjective intent of the parties when they entered into the agreement.

No inquiry as to the subjective intent of the applicant or PTO is appropriate or even possible in the context of a patent infringement suit. The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history). *See Senmed,* 888 F.2d at 817 n. 8, 12 USPQ2d at 1512 n. 8. In fact, commonly the claims are drafted by the inventor's patent solicitor and they may even be drafted by the patent examiner in an examiner's amendment (subject to the approval of the inventor's solicitor). *See* Manual of Patent Examining Procedure (MPEP) § 1302.04 (Rev. 15, Aug. 1993) ("Examiner's Amendments and Changes"). While presumably the inventor has approved any changes to the claim scope that have occurred via amendment during the prosecution process, it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO. *See generally Senmed,* 888 F.2d at 819 n. 8, 12 USPQ2d at 1521 n. 8. Of course the views of the other party to the "patent contract," the government, are generally not

14. A patent, however, is not a contract. Contracts are executory in nature—they contain promises that must be performed. *See* E. Allan Farnsworth, *Contracts* § 1.1, at 3–4 (2d ed. 1990). Once a patent is issued, any purported exchange of promises between the applicant and the Patent and Trademark Office (PTO) has been fully executed. A patent is a statutory grant of the right to exclude others from making, using, or selling the invention recited in the claims, read in light of the specification. 35 U.S.C.

§ 154. There is no discretion on the part of the PTO as to whether or not to grant the patent—if the statutory requirements are met, a patent is issued. 35 U.S.C. § 151. Likewise, the other party to the transaction, the patentee, cannot "contract" with any one other than the federal government to receive a right to exclude others from making, using, or selling his invention. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 162, 109 S.Ct. 971, 983, 103 L.Ed.2d 118 (1989).

obtainable, except as reflected in the prosecution history. *See Western Elec. Co. v. Piezo Tech., Inc.,* 860 F.2d 428, 432–33, 8 USPQ2d 1853, 1856–57 (Fed.Cir.1988); MPEP § 1701.01 ("Office personnel not to testify").

Thus the focus in construing disputed terms in claim language is not the subjective intent of the parties to the patent contract when they used a particular term. Rather the focus is on the objective test of what one of ordinary skill in the art at the time of the invention would have understood the term to mean.

Moreover, ideally there should be no "ambiguity" in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history. Section 112 of Title 35 requires that specifications "contain a written description of the invention, and of the manner and process of making and using it, in such *full, clear, concise, and exact* terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same ..." and requires that the specification "shall conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as his invention." 35 U.S.C. § 112 (emphasis added). This statutory language has as its purpose the avoidance of the kind of ambiguity that allows introduction of extrinsic evidence in the contract law analogy. *See, e.g., Keystone,* 95 U.S. at 278 ("When the terms of a claim in a patent are clear and distinct (*as they always should be* ), the patentee, in a suit brought upon the patent, is bound by it.") (emphasis added). Patent applications, unlike contracts, are reviewed by patent examiners, quasi-judicial officials trained in the law and presumed to "have some expertise in

interpreting the [prior art] references and to be familiar from their work with the level of skill in the art and whose duty it is to issue only valid patents." *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359, 220 USPQ 763, 770 (Fed.Cir.1984). *See also Western Electric,* 860 F.2d at 431, 8 USPQ2d at 1857. If the patent's claims are sufficiently unambiguous for the PTO, there should exist no factual ambiguity when those same claims are later construed by a court of law in an infringement action. *See Intervet Am.,* 887 F.2d at 1053, 12 USPQ2d at 1476 ("Ambiguity, undue breadth, vagueness, and triviality are matters that go to claim *validity* for failure to comply with 35 U.S.C. § 112–¶ 2, not to interpretation or construction.") (emphasis in original).

This does not mean there is never a need for extrinsic evidence in a patent infringement suit. A judge is not usually a person conversant in the particular technical art involved and is not the hypothetical person skilled in the art to whom a patent is addressed. Extrinsic evidence, therefore, may be necessary to inform the court about the language in which the patent is written. But this evidence is not for the purpose of clarifying ambiguity in claim terminology. It is not ambiguity in the document that creates the need for extrinsic evidence but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed.

Accordingly, the contract, deed, and will cases relied upon in the dissenting and concurring opinions serve only to highlight the differences between claim construction in a patent infringement case and contract interpretation in a breach of contract suit or construction/interpretation of a will in a will contest. They reflect the court's concern with finding the "true" intention of the parties to an agreement, deed, or will.[15] This

---

**15.** Illustrative of the search for the intent of the parties or the makers are the following opinions cited in the dissenting and concurring opinions. *Goddard v. Foster,* 84 U.S. (17 Wall.) 123, 142–43, 21 L.Ed. 589 (1873) (in a contract between two parties, courts "are not denied the same light and information the parties enjoyed when the contract was executed, but they may acquaint themselves with the persons and circumstances that are the subjects of the statements in the written agreement"); *Brown & Co. v. McGran,*

39 U.S. (14 Pet.) 479, 493, 10 L.Ed. 550 (1840) ("[T]he true interpretation of the language may be left to the consideration of the jury for the purpose of carrying into effect the real intention of the parties."); *Startex Drilling Co. v. Sohio Petroleum Co.,* 680 F.2d 412, 415 (5th Cir.1982) (submitting case to jury "to determine what the parties meant" by ambiguous terms in the contract); *In re Union Trust Co.,* 89 Misc. 69, 151 N.Y.S. 246, 249 (Sur.Ct.) ("The first and cardinal rule of interpretation of wills is the application of

sort of inquiry is not appropriate, or even possible, in the context of patent litigation. Infringement litigation may involve multiple actions against different defendants none of whom has any personal knowledge of or participation in the PTO proceedings where the give and take that results in the negotiated claim language occurs. Thus there can be no search for the defendant party's intent.

C. The more appropriate analogy for interpreting patent claims is the statutory interpretation analogy. Statutory interpretation is a matter of law strictly for the court. There can be only one correct interpretation of a statute that applies to all persons. Statutes are written instruments that all persons are presumed to be aware of and are bound to follow. Statutes, like patents, are enforceable against the public, unlike private agreements between contracting parties. When interpreting statutes, a court looks to the language of the statute and construes it according to the traditional tools of statutory construction, including certain well known canons of construction. *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1365, 1368 (Fed.Cir.1983). A court may also find it necessary to review the legislative history of the statute, which is itself a matter of public record, just as the specification and prosecution history of a patent are public records. *Id.* at 1369. While a court may seek from the public record to ascertain the collective intent of Congress when it interprets a statute, the subjective intent of any particular person involved in the legislative process is not determinative. Thus the members of Congress, or staffpersons who draft legislation, are not deposed or called on to testify in actions involving statutory interpretation. Similarly, the subjective meaning that a patentee may ascribe to claim language is also not determinative. Thus, it is from the public record that a court should seek in a patent

infringement case to find the meaning of claim language.

■ There are, of course, differences between a statute and a patent. But because both of these public instruments may create liability in third persons who were not participants in the legislative process or the PTO proceedings, as the case may be, we conclude that the statutory interpretation model is a more accurate model than the contractual one for purposes of determining whether constitutional protections are transgressed by assigning claim construction exclusively to judges.

D. The dissenting opinion and one of the concurring opinions, along with Markman and certain of the amici, contend that assigning claim construction exclusively to judges is in conflict with certain decisions of the Supreme Court. We are not persuaded. The dissenting and concurring opinions place heavy reliance on two Supreme Court cases, *Silsby v. Foote*, 55 U.S. (14 How.) 218, 14 L.Ed. 391 (1852), and *Bischoff v. Wethered*, 76 U.S. (9 Wall.) 812, 19 L.Ed. 829 (1869), for the proposition that questions of fact may arise in the determination of the scope of a patent claim. A close examination of these cases, however, reveals they do not support that argument.[16]

In *Silsby v. Foote*, the Court affirmed a trial judge who left the question of what elements were "essential" for the claimed invention to the jury. According to the Court, the claim in that case stated: "I also claim the combination, above described, by which the regulation of the heat of the stove, or other structure in which it may be used, is effected." *Id.*, 55 U.S. at 226. The Court agreed with the petitioner that "[t]he construction of the claim was undoubtedly for the court." *Id.* at 225. The Court continued, however, that "[w]hen a claim does not point out and designate the particular elements

---

the meaning of the testator, not the meaning of the adjudications."), *modified*, 179 A.D. 176, 156 N.Y.S. 32 (1915); *see also Reed v. Proprietors of Locks & Canals on Merrimac River*, 49 U.S. (8 How.) 274, 288, 12 L.Ed. 1077 (1850) ("Whereas the intention of the parties is to be found in their deed alone, which it is the duty of the court to construe.").

16. One concurring opinion also relies on *Winans v. Denmead*, 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), as a case where the court "construed" the claim in a general manner and left it for the jury to fill in specifics. As correctly noted by the dissent, this case is more properly understood as one involving the doctrine of equivalents infringement notwithstanding the literal language of the claims.

which compose a combination, but only declares, as it properly may, that the combination is made up of so much of the described machinery as effects a particular result, it is a question of fact which of the described parts are essential to produce that result." *Id.* at 226. Thus the Court concluded that where a combination claim does not point out the elements of the claim but rather describes "machinery as effects a particular result," the jury may determine "which of the described parts are essential to produce that result." Otherwise, the question of claim scope belonged to the court.

It is difficult to see how *Silsby* supports the views set forth in the dissenting and concurring opinions. This is especially so because applicants are now required by 35 U.S.C. § 112 to particularly point out and distinctly claim the subject matter the applicant regards as his invention and this requirement applies with equal force to claims having means-plus-function limitations. The only jury-triable issue described in *Silsby* on the question of claim scope is now statutorily foreclosed. Further, a jury is not allowed to canvass the patent specification to evaluate what portions of a combination claim are "essential" to produce a particular result. *See Keystone,* 95 U.S. at 278 ("This provision [the predecessor to section 112, para. 2] was inserted in the law for the purpose of relieving the courts from the duty of ascertaining the exact invention of the patentee by inference and conjecture, derived from a laborious examination of the previous inventions, and a comparison thereof with that claimed by him."). Both this court and the Supreme Court have made clear that all elements of a patent claim are material, with no single part of a claim being more important or "essential" than another. *See Fay v. Cordesman,* 109 U.S. 408, 420–21, 3 S.Ct. 236, 243–45, 27 L.Ed. 979 (1883); *Pennwalt Corp. v. Durand–Wayland, Inc.,* 833 F.2d 931, 936, 4 USPQ2d 1737, 1741 (Fed.Cir.1987) (in banc).

The reliance on *Bischoff v. Wethered* is even more puzzling. *Bischoff* did not even involve an infringement issue but rather involved a question of invalidity in a breach of contract action. The plaintiff, who sought to invalidate the patent on the basis of a prior art patent, argued that the court, and not the jury, should have decided the question of "identity or diversity of the inventions." *Bischoff,* 76 U.S. at 816. The Court disagreed. While the Court again acknowledged that "*construction* of written instruments is the province of the court alone," it concluded that in this case "[i]t is not the *construction of the instrument,* but the *character of the thing invented,* which is sought in questions of identity and diversity of inventions." *Id.* at 816.

Markman's case does not involve a question of identity or diversity of inventions. The word "claim" does not even appear in the *Bischoff* case. Rather *Bischoff* is concerned with divining the "character of the thing invented" from the patent in suit and the prior art patent. It is difficult, if not impossible, to discern any legal principle from *Bischoff* that relates to claim construction in the context of patent infringement. To the extent the dissenting and concurring opinions view claim construction in an infringement case as a search for the "character" of the thing invented, we disagree.

Finally, the concurring opinions consider that much of our opinion is dictum because there is no "genuine" dispute as to the claim term "inventory." As we have demonstrated, Markman squarely raised the issue of whether the court acted within its power in granting JMOL after the jury had construed the claims. The trial court viewed claim construction as a legal question and determined that it could decide the meaning of the term "inventory" as a matter of law based on the patent document and prosecution history. Markman, on the other hand, viewed the construction of the claim as one of fact with the jury verdict being supported by the evidence.

## CONCLUSION

Correctly reasoning that claim construction is a matter of law for the court, the district court properly rejected the jury's verdict and granted JMOL. Upon our *de novo* review of the court's construction of the claim language, we agree that "inventory" in claim 1 includes within its meaning "articles of clothing." It is undisputed that West-

view's device does not and cannot track articles of clothing. Accordingly, there is no substantial evidence to support the jury's finding of infringement of claims 1 and 10 of United States Reissue Patent No. 33,054 when those claims are correctly construed. The district court's grant of judgment of noninfringement as a matter of law is

*AFFIRMED.*

MAYER, Circuit Judge, concurring in the judgment.

Today the court jettisons more than two hundred years of jurisprudence and eviscerates the role of the jury preserved by the Seventh Amendment of the Constitution of the United States; it marks a sea change in the course of patent law that is nothing short of bizarre. Sadly, this decision represents a secession from the mainstream of the law. It portends turbulence and cynicism in patent litigation. For this is not just about claim language, it is about ejecting juries from infringement cases. All these pages and all these words cannot camouflage what the court well knows: to decide what the claims mean is nearly always to decide the case.

But today's action is of a piece with a broader bid afoot to essentially banish juries from patent cases altogether. If it succeeds juries will be relegated, in those few cases where they have any presence at all, to rubber stamps, their verdicts preordained by "legal" and "equitable" determinations that brook only one "reasonable" result. Indeed, this movement would vest authority over patent disputes in legislative courts, unconstrained by Article III and the Seventh Amendment. *See In re Lockwood*, 50 F.3d 966, 970 (Fed.Cir.1995) (opinion dissenting from order denying rehearing in banc) ("A constitutional jury right to determine validity of a patent does not attach to this public grant. Congress could place the issue of validity entirely in the hands of an Article I trial court with particular expertise if it chose to do so."). Declaiming that the jury is a "black box" incapable of a "reasoned decision", several judges of the court have already advised that they are aboard this campaign. *Id.,* at 990. The quest to free patent litigation from the "unpredictability" of jury verdicts, and generalist judges, results from insular dogmatism inspired by unwarrantable elitism; it is unconstitutional.

The question is whether the interpretation of patent claims is a purely legal exercise—always decided by the judge as a matter of law and never raising a question of fact—or rather a mixed question of law and fact, in which some factual matters might need to be resolved by the factfinder on the way to construing the claims as a matter of law. The answer is critical to how questions of claim interpretation are decided at the trial level and how we review them on appeal.

The ultimate issue of patent scope, depending as it does on the legal effect of the words of the claims, is a question of law. But it does not necessarily follow that the judge is to decide every question that arises during the course of claim construction as a matter of law. *Cf. Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966) (obviousness is a legal conclusion with underlying factual determinations).[1] Instead, characterization of claim construction as "legal" begs the questions whether fact issues may arise subsidiary to the ultimate legal conclusion, how such issues are to be decided, and by whom.

Contrary to what it says today, this court (including the judges in the majority) has always held that claim interpretation is a matter of law depending on underlying factual inquiries. *See, e.g., Arachnid Inc. v. Medalist Mktg. Corp.,* 972 F.2d 1300, 1302, 23

---

1. While the ultimate question of patent validity is one of law, *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966), there are a number of underlying inquiries that raise questions of fact. In addition to obviousness, these include anticipation, *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.,* 750 F.2d 1569, 1573, 224 USPQ 409, 411 (Fed.Cir.1985), prior public use or sale, *U.S. Envtl. Prods., Inc. v. Westall,* 911 F.2d 713, 715, 15 USPQ2d 1898, 1900 (Fed.Cir.1990) (a legal conclusion supported by underlying facts), and sufficiency of a specification's disclosure, *Utter v. Hiraga,* 845 F.2d 993, 998, 6 USPQ2d 1709, 1714 (Fed.Cir. 1988) (same).

USPQ2d 1946, 1948 (Fed.Cir.1992) (though claim construction is issue of law for the court, it "may require the factfinder to resolve certain factual issues such as what occurred during the prosecution history"); *Lemelson v. General Mills Inc.*, 968 F.2d 1202, 1206, 23 USPQ2d 1284, 1288 (Fed.Cir.1992) (same, noting that "underlying factual issues in dispute become the jury's province to resolve in the course of rendering its verdict on infringement"); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579, 12 USPQ2d 1382, 1386 (Fed. Cir.1989) ("A disputed issue of fact may, of course, arise in connection with interpretation of a term in a claim if there is a genuine evidentiary conflict created by the underlying probative evidence pertinent to the claim's interpretation. However, without such evidentiary conflict, claim interpretation may be resolved as an issue of law by the court...." (citation omitted)); *see also Tol–O–Matic Inc. v. Proma Produkt–Und Mktg.*, 945 F.2d 1546, 1552, 20 USPQ2d 1332, 1338 (Fed.Cir. 1991) (substantial evidence supported jury's presumed fact findings on disputed terms and prosecution history); *Smithkline Diagnostics Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 885, 8 USPQ2d 1468, 1474 (Fed.Cir. 1988) (fact findings on disputed prosecution history clearly erroneous); *Perini America v. PCM Co.*, 832 F.2d 581, 586, 4 USPQ2d 1621, 1625 (Fed.Cir.1987) (in bench trial, court's interpretation of disputed claim terms not clearly erroneous); *Tillotson Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1039, 4 USPQ2d 1450, 1454 (Fed.Cir.1987) (vacating summary judgment where construction turns on factual disputes arising from specification, prosecution history, and industry practice); *Tandon Corp. v. ITC*, 831 F.2d 1017, 1021, 4 USPQ2d 1283, 1286 (Fed.Cir.1987) (Commission's findings on prosecution history and meaning of terms supported by substantial evidence); *H.H. Robertson Co. v. United Steel Deck Inc.*, 820 F.2d 384, 389, 2 USPQ2d 1926, 1929 (Fed.Cir.1987) (in bench trial, court's fact findings on claim terms not clearly erroneous); *Howes v. Medical Components Inc.*, 814 F.2d 638, 646, 2 USPQ2d 1271, 1275 (Fed.Cir.1987) (vacating summary judgment because of fact issues surrounding prosecution history); *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 657, 229 USPQ 992, 995 (Fed.Cir.1986) (vacating summary judgment where terms create underlying fact dispute); *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 976, 226 USPQ 5, 9 (Fed.Cir.1985) (vacating summary judgment where fact question of equivalents of "means plus function" claim disputed); *Bio–Rad Lab., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 614, 222 USPQ 654, 662 (Fed.Cir.1984) (substantial evidence supported jury interpretation of disputed terms); *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 675, 221 USPQ 944, 951 (Fed.Cir. 1984) (reversing jury verdict where construction premised on facts not supported by substantial evidence). So it is remarkable that the court so casually changes its collective mind, especially when the just cited precedent was compelled by the Seventh Amendment and not the mere preference of a sufficient number of judges.[2] The court's revisionist reading of precedent to loose claim interpretation from its factual foundations will have profoundly negative consequences for the well-established roles of trial judges, juries, and our court in patent cases.

### . I.

Anyone who wants to know what a patent protects must first read its claims, for they are the measure of its scope. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339, 81 S.Ct. 599, 601, 5 L.Ed.2d 592 (1961). Claim language does not exist in a vacuum; it must be understood by reference to the documents annexed to the patent grant, including the specification, of which the claims are a part, and any drawings. *Autogiro Co. of Am. v. United States*, 384

---

**2.** The court pretends there is a line of contrary authority. *Ante* at 986–87. But most of its cases arrived at this court after bench trials—a puzzling source for guidance on the commands of the Seventh Amendment; others actually implicating the right to a jury trial sprang from facts simply inadequate to support a reasonable jury verdict. Indeed, the one case that pays lip service to this novel rule, *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 822–23, 23 USPQ2d 1426, 1432–33 (Fed.Cir.1992), like this case, did not require excursion beyond the patent documents themselves. There may be a reason why the court is hellbent for its result, but it does not emanate from the cases.

F.2d 391, 397, 181 Ct.Cl. 55, 155 USPQ 697, 702 (1967). The prosecution history often proves useful in determining a patent's scope, for it reveals the course of dealing with the Patent Office, which may show a particular meaning attached to the terms, or a position taken by the applicant to ensure that the patent would issue. *Graham v. John Deere Co.*, 383 U.S. at 33, 86 S.Ct. at 701. These documents are always available during the course of claim interpretation; they are not extrinsic evidence, though some opinions so characterize them, because they are essentially incorporated into the patent itself.

Patents are directed to those skilled in the art. The task of determining just what the claims mean to skilled artisans falls, in the first instance, to the court. But if, after consideration of all of this documentation, the judge cannot readily resolve the meaning of the claims, he resorts to extrinsic evidence to shed light on them. *Moeller*, 794 F.2d at 657, 229 USPQ at 995 (trial judge's failure to allow expert testimony was abuse of discretion). This evidence, in the form of prior art documentary evidence or expert testimony, can show what the claims would mean to those skilled in the art. The content of the prior art and the testimony of technical experts can reveal how others use and understand technical terms that may appear ambiguous or opaque to the judge, who rarely has the knowledge of those skilled in the field of the patent. The inventor himself may qualify as an expert and testify what his

claims would mean in the relevant art.[3] The judge can even advert to the testimony of patent law experts—that is, patent lawyers—for advice on the interpretation of claims.[4] If this information clarifies the meaning of the claims and is uncontested, the judge may rule as a matter of law.

But sometimes extrinsic evidence results in a genuine dispute over the meaning of a term or an event during prosecution.[5] When that happens, it falls to the finder of fact to settle it. *Lemelson*, 968 F.2d at 1206, 23 USPQ2d at 1288; *Tol–O–Matic Inc. v. Proma Produkt–Und Mktg.*, 945 F.2d at 1550, 20 USPQ2d at 1336; *Smithkline Diagnostics Inc. v. Helena Lab. Corp.*, 859 F.2d at 882, 8 USPQ2d at 1472; *Palumbo v. Don–Joy Co.*, 762 F.2d at 974, 226 USPQ at 8.

When a question of claim construction arrives here on appeal, this court reviews the ultimate construction given the claims under the de novo standard applicable to all legal conclusions. But any facts found in the course of interpreting the claims must be subject to the same standard by which we review any other factual determinations: for clear error in facts found by a court; for substantial evidence to support a jury's verdict. Fed.R.Civ.P. 52(a); *Perini America v. PCM Co.*, 832 F.2d at 584, 4 USPQ2d at 1624; *McGill Inc. v. John Zink Co.*, 736 F.2d at 672, 221 USPQ at 948.

This standard recognizes the jury's important role in making factual determinations,

---

**3.** Of course, the inventor's testimony as to what he intended or how he understands the patent, as opposed to his testimony as an expert, may be relevant, but is entitled to little weight in the face of evidence to the contrary. *See North American Vaccine v. American Cyanamid Co.*, 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed.Cir.1993) (inventor's "after-the-fact testimony is of little weight compared to the clear import of the patent disclosure itself"); *Intellical, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387, 21 USPQ2d 1383, 1386 (Fed.Cir.1992) ("where a disputed term would be understood to have its ordinary meaning by one of skill in the art from the patent and its history, extrinsic evidence that the inventor may have subjectively intended a different meaning does not preclude summary judgment.").

**4.** A fact dispute cannot arise solely from testimony of a patent law expert. While this sort of

testimony is acceptable, even if often overdone, as an interpretive aid to the court, it is not evidence and cannot create a genuine fact question for the jury. *See Nutrition 21 v. United States*, 930 F.2d 862, 871 n. 2, 18 USPQ2d 1347, 1350 n. 2 (Fed.Cir.1991) (patent law expert's "opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all"); *see also Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1564, 7 USPQ2d 1548, 1554 (Fed.Cir.1988) (conflicting opinions of legal experts create no material issue of fact).

**5.** Of course, not every disagreement gives rise to a genuine fact question. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1386 (Fed.Cir.1989); *see also Senmed Inc. v. Richard–Allen Medical Indus.*, 888 F.2d 815, 819 n. 8, 12 USPQ2d 1508, 1512 n. 8 (1989) (inventor's testimony as to meaning of "on" contrary to ordinary meaning raised no real "dispute").

and the role of the trial court as the primary decisionmaker in bench trials. A trial is "the 'main event' . . . rather than a 'tryout on the road.'" *Anderson v. City of Bessemer City,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). By broadly proclaiming all aspects of claim interpretation to be legal, the court today usurps a major part of the functions of both trial judge and jury in patent cases, obliterating the traditional, defined differences between the roles of judge and jury, and trial and appellate courts.

## II.

Beyond any policy argument supporting the traditional roles of judge and jury in patent cases, the court's decision today flies in the face of the constitutional right to a jury promised by the Seventh Amendment of the Constitution. That promise, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," protects litigants' right to a jury trial where legal, as opposed to equitable, causes are to be determined. *Chauffers, Teamsters & Helpers Local No. 391 v. Terry,* 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990). The amendment does not create an independent right to trial by jury but gives parties rights equivalent in scope to those that existed at common law, in England in 1791, when the Bill of Rights was ratified. *Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987). It does not stop there, however; it extends as well to statutory actions subsequently created by Congress if they are analogous to actions decided in the law courts of eighteenth century England. *Id.*

The Seventh Amendment does not guarantee the right to have a jury decide all issues in a case. It properly resolves only factual questions, while legal matters are for the court. Even within the realm of factual questions, whether a particular question must always go to the jury depends "on whether the jury must shoulder this responsibility as necessary to preserve the 'substance of the common-law right of trial by jury.'" *Id.* at 426, 107 S.Ct. at 1840 (quoting *Colgrove v. Battin,* 413 U.S. 149, 152, 93 S.Ct.

2448, 2450, 37 L.Ed.2d 522 (1973)). The Seventh Amendment was intended not to formalize any particular rigid procedural rules, but "to preserve the basic institution of trial by jury in only its most fundamental elements. . . ." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 337, 99 S.Ct. 645, 658, 58 L.Ed.2d 552 (1979) (quoting *Galloway v. United States,* 319 U.S. 372, 392, 63 S.Ct. 1077, 1088, 87 L.Ed. 1458 (1943)); *see also Baltimore & Carolina Line, Inc. v. Redman,* 295 U.S. 654, 657, 55 S.Ct. 890, 891, 79 L.Ed. 1636 (1935) ("particularly to retain the common-law distinction between the province of the court and that of the jury"). But where a particular issue goes to these "fundamental elements" or the "substance of the common-law right of trial by jury," no court may constitutionally remove it from the jury. *See Walker v. New Mexico & So. Pac. R. Co.,* 165 U.S. 593, 596, 17 S.Ct. 421, 422, 41 L.Ed. 837 (1897) (Seventh Amendment "requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative."); *see also Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989) (even Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury."). The court's action in this case does just that.

An action for patent infringement is one that would have been heard in the law courts of old England. *See, e.g., Bramah v. Hardcastle,* 1 Carp.P.C. 168 (K.B.1789), *reprinted in* I *Decisions on the Law of Patents for Inventions* 51, 53 (Benjamin V. Abbott ed.) (1887) [hereinafter Abbott] (jury trial of infringement action; jury instructed that patent was invalid, but jury verdict for plaintiff not disturbed); *Morris v. Bramsom,* 1 Carp. P.C. 30 (K.B.1776), *reprinted in* Abbott, *supra,* at 21 (jury trial of infringement action); *see also Boulton v. Bull,* 1 Carp P.C. 117 (C.P.1795), *reprinted in* Abbott, *supra,* at 59, 74 ("[I]nfringement or not, is a question for the jury; in order to decide this case, they must understand the nature of the improvement or thing infringed. . . ."). In this country, a jury trial has always been available in patent cases where damages are sought. In-

deed, the first Patent Act, in 1790, expressly provided that a patent owner was entitled to "such damages as shall be assessed by a jury." Act of April 10, 1790, ch. 7, § 4, 1 Stat. 109. In such cases, the jury has been entrusted with ruling on the ultimate question of infringement, as well as any factual disputes that arise subsidiary to the determination of the legal question of patent validity.

Not infrequently, the ultimate question of infringement, indisputably a matter for the jury, is effectively dictated by the construction given the patent claims. This happens, of course, when the judge affirmatively takes the question from the jury by granting summary judgment or judgment as a matter of law, as it did here; it can also occur when, even though the judge sends the question to the jury, his interpretation of the claims forces the jury's decision on infringement. That is to say, choosing between contending interpretations of a claim can decide the matter of infringement for all intents and purposes. Our constitutional mandate to preserve the right to jury trial therefore demands that we view any intrusion on the jury's role in deciding infringement with deep suspicion. *See Dimick v. Schiedt*, 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935) ("Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with utmost care.").

Today's decision also threatens to do indirectly what we have declined to do directly, that is, create a "complexity exception" to the Seventh Amendment for patent cases. *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1130, 227 USPQ 577, 592 (Fed.Cir.1985) (Markey, C.J., additional views). But there is simply no reason to believe that judges are any more qualified than juries to resolve the complex technical issues often present in patent cases. *Id.* at 1128 & n. 7, 227 USPQ at 591 & n. 7. Indeed, the effect of this case is to make of the judicial process a charade, for notwithstanding any trial level activity, this court will do pretty much what it wants under its de novo retrial. We have consistently stressed that the same rules apply to patent cases as apply to all other civil disputes. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1547, 220 USPQ 193, 197 (1983) ("So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases."). The court subverts this principle and the demands of the Seventh Amendment by the ruse of reclassifying factual questions as legal ones.

## III.

Those who argue for interpretation of claims solely as a matter of law by the judge spew a panoply of cases ostensibly in support. Close examination of these cases, however, reveals that, like the one before us today, interpretation of the claims at issue before the deciding court presented no real factual question. Thus, for example, in *Hogg v. Emerson*, 47 U.S. (6 How.) 437, 484, 12 L.Ed. 505 (1848), the Court stated that "without the aid of experts and machinists, [we have] no difficulty in ascertaining, from the language used here," the meaning of the patent. Similarly, *Winans v. New York & Erie R.R. Co.*, 62 U.S. (21 How.) 88, 100, 16 L.Ed. 68 (1858), allowed the possibility that "experts may be examined to explain terms of art, and the state of the art at any given time. They may explain to the court and jury the machines, models, or drawings exhibited." But the Court went on to say that there was only one construction of the patent "which the language of this specification will admit" and "it would be wholly superfluous to examine experts to teach the court, what they could clearly perceive without such information." *Id.*, 62 U.S. at 101. *Brown v. Piper*, 91 U.S. 37, 41, 23 L.Ed. 200 (1847), recognized that evidence on "what was old and in general use at the time of the alleged invention" was admitted at the trial but that it was unnecessary. "[W]e think the patent was void on its face, and that the court might have stopped short at that instrument, and without looking beyond it into the answers and testimony, *sua sponte*, if objection were not taken by counsel, well have adjudged in favor of the defendant." *Id.*, 91 U.S. at 44.

*See also U.S. Indus. Chem., Inc. v. Carbide & Carbon Chem. Corp.,* 315 U.S. 668, 677, 62 S.Ct. 839, 844, 86 L.Ed. 1105 (1942) ("[O]n the face of the papers, the process described in the original patent included a step [omitted from the reissue]," and the trial court erroneously relied on unnecessary expert opinion in its improper conclusion that the reissue was not invalid.); *Exhibit Supply Co. v. Ace Corp.,* 315 U.S. 126, 134, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942) ("examination of the drawings and specifications indicates clearly enough" the meaning of the claim); *Smith v. Snow,* 294 U.S. 1, 14, 55 S.Ct. 279, 284, 79 L.Ed. 721 (1935) ("Examination of the claim, in light of both [undisputed] scientific fact and of the particular form in which the petitioner reduced the claim to practice as described in the specifications, makes it plain" what are the claim's relevant limitations.).

These cases simply do not address the effect of extrinsic evidence giving rise to a legitimate fact question. They are cases where the documentary record alone was wholly adequate to derive the patent's proper construction.[6] It is hardly surprising that courts would treat claim interpretation under these circumstances as a matter of law, for it could not be otherwise. *See* Fed.R.Civ.P. 50(a) (court may grant judgment as a matter of law where underlying facts could not support reasonable jury verdict to the contrary), and 56(c) (summary judgment appropriate where there is no genuine issue as to any material fact); *Newell Companies, Inc. v. Kenney Mfg. Co.,* 864 F.2d 757, 762, 763, 9 USPQ2d 1417, 1421–22 (1988) (approving use of judgment as a matter of law and summary judgment on obviousness where underlying facts are not disputed).

Indeed, some cases cited in support of a purported rule that claim construction is always entirely a matter of law expressly limit the rule to those cases where the patent may be understood on the basis of the documents alone, without resort to extrinsic evidence; these cases acknowledge that fact questions could be raised that would require submission to a jury. In *Heald v. Rice,* 104 U.S. 737, 749, 26 L.Ed. 910 (1881), the Supreme Court explained:

> That is, if it appears from the face of the instruments that extrinsic evidence is not needed to explain terms of art, or to apply the descriptions to the subject-matter, so that the court is able from mere comparison to say what is the invention described in each, and to affirm from mere comparison that the inventions are not the same, but different, then the question of identity is one of pure construction, and not of evidence, and consequently is a matter of law for the court, without any auxiliary matter of fact to be passed upon by a jury, if the action be at law.

The Court there determined that it had a case in which the question could be determined "from the mere reading of the two specifications" and that it was "too plain for argument that they are perfectly distinct." *Id.,* 104 U.S. at 753; *see also Singer Mfg. Co. v. Cramer,* 192 U.S. 265, 275, 24 S.Ct. 291, 295, 48 L.Ed. 437 (1904) ("As in each of the patents in question it is apparent from the face of the instrument that extrinsic evidence is not needed … the question of infringement or no infringement is one of law…."); *Market St. Cable Ry. Co. v. Rowley,* 155 U.S. 621, 625, 15 S.Ct. 224, 226, 39 L.Ed. 284 (1894) (same as *Heald v. Rice* ). These cases recognize that where extrinsic evidence is required and raises a real factual dispute, the question is no longer one of "pure construction," so that the jury must play its role in the construction of the claims.

---

**6.** In one case where it appeared the Court "avail[ed] itself of the light furnished by the evidence to enable it to understand the terms used in the patent and the devices and operations described or alluded to therein," *Webster Loom Co. v. Higgins,* 105 U.S. 580, 586, 26 L.Ed. 1177 (1881), the evidence was examined in ruling on the issue of enablement, i.e., whether those of skill in the art would understand the terms of the patent. Even given the conflicting testimony, the Court concluded that the terms of the patent were "sufficiently clear and full in the description of the invention." *Id.* 105 U.S. at 589. When it reached the question of infringement, however, it did not mention any evidence other than the specification and claims and stated "if we examine the language of the claim [in light of the specification], it seems to us that all doubt as to its meaning is removed." *Id.* at 598. There was no reliance on any extrinsic evidence in construing the claims for purposes of infringement.

But where the question has arisen—where the proper construction of claims depends on the resolution of a factual dispute—the Supreme Court has stated in no uncertain terms that the jury has the duty to decide. These are cases where the meaning of a patent may not be derived from its terms alone, forcing the judge to go beyond the documentary evidence for aid. This gives rise to issues of historical fact the resolution of which must be left to a jury.

The claim before the court in *Silsby v. Foote,* 55 U.S. (14 How.) 218, 14 L.Ed. 391 (1852), was directed to "the combination, above described, by which the regulation of the heat of the stove, or other structure in which it may be used, is effected." *Id.,* 55 U.S. at 226. The specification disclosed a stove containing a number of discrete parts. To be sure, the judge "construed the claim"; he instructed the jury that it covered "a combination of such of the described parts as were combined and arranged for the purpose of producing a particular effect, viz., to regulate the heat of a stove." *Id.* at 225. But the defendants asked the judge to rule as a matter of law that the parts referred to in the claim were "the index, the detaching process, and the pendulum." *Id.* at 226. The trial court refused, holding that this question was for the jury.

The Supreme Court affirmed asking, "How could the Judge know this as a matter of law?" *Id.* Once the trial court had construed the claim and instructed the jury, "it therefore became a question for the jury, upon the evidence of experts, or an inspection by them of the machines, or upon both, what parts described did in point of fact enter into, and constitute an essential part of this combination." *Id.* Only then could the jury determine if the accused device contained all of these elements and was therefore an infringement. The Court said the "defendants' counsel exhibited to the court the models of the machines of the defendants and the plaintiff, for the purpose of satisfying the court the jury must have understood *they were at liberty to construe the claim,* and that *they did in truth so construe it,* as to exclude from the combination claimed by the plaintiff, what is called the detaching process." *Id.* (emphasis added).

Again in *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1853), the court "construed" the claim in a general manner and left it for the jury to fill in the specifics. The claim at issue was directed to a rail car for the transportation of coal "in the form of a frustum of a cone, substantially as herein described, whereby the force exerted by the weight of the load presses equally in all directions." *Id.,* 56 U.S. at 342. The defendant requested the jury be instructed that the claim was limited to a circular form only, as was described in the specification and did not cover the defendant's rectilinear design. The Supreme Court affirmed the trial court's refusal of the instructions, stating that "where the whole substance of the invention may be copied in a different form, it is the duty of the courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent, and which the patent was designed to secure." *Id.* at 343.

The Court considered how far an alleged infringing car could depart from the form of a perfect circle and still infringe, and determined that the claim encompassed anything "so near to a true circle as substantially to embody the patentee's mode of operation, and thereby attain the same result as was reached by his invention." *Id.* at 344. It cited evidence, including expert testimony as to the mode of operation of the patentee's car and whether the accused car attained the same results as the claimed car. The Court unmistakably left it to the jury to determine the meaning of the claim, its scope, and refused to proclaim it a matter of law outside the province of the jury. *Id.*

These cases are especially relevant because they show that the jury has always had a role in determining a patent's scope. This historic reliance on juries to aid the court in deciding exactly what patents protect matters here because the Seventh Amendment demands that courts preserve the right to jury trial as it existed at common law. Old cases are obviously instructive under this peculiar standard. Accordingly, efforts to distinguish *Silsby* and *Winans* because of

their age are disingenuous. This court has no office to invoke desuetude to evade the Seventh Amendment and the Supreme Court.

Our patent laws have always required inventors to point out their inventions in detail sufficient to both distinguish the prior art and tell the public what protection the patent confers. The very first patent act required that letters patent "describ[e] the said invention or discovery, clearly, truly, and fully." Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109. The applicant for a patent was at the time required to submit "a specification in writing, containing a description ... of the thing or things by him or them invented or discovered, ... which specification shall be so particular ... as ... to distinguish the invention or discovery from other things before known and used." *Id.* § 2. The word "claim" first appeared in the Act of 1836, ch. 357, § 6, 5 Stat. 117 (July 4, 1836), requiring that the applicant "shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention." Claims, per se, were not expressly required until the Act of 1870, ch. 230, § 26, 16 Stat. 198 (July 8, 1870), which said the applicant "shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery", but they were in common use much earlier in rudimentary form. *See, e.g., Evans v. Eaton,* 20 U.S. (7 Wheat.) 356, 428, 5 L.Ed. 472 (1822) (Specification concluded: "I claim as my invention, the peculiar properties or principles which this machine possesses, in spreading, turning and gathering the meal, at one operation, and the rising and lowering its arms, by its motion, to accommodate itself to any quantity of meal it has to operate on.").

In light of this history, it is apparent that the 1870 Act simply codified the preference for particular claiming already expressed by the Supreme Court. *See Brooks v. Fiske,* 56 U.S. (15 How.) 212, 215, 14 L.Ed. 665 (1853) (specification and drawings to be considered "only for the purpose of enabling us to cor-

rectly interpret the claim"). This change from a regime of "central" claiming to one of "peripheral" claiming may seem a major step in the patent discipline, but the distinction it represents is irrelevant to the Seventh Amendment. When the trial court in *Silsby* construed the claim there at issue, it was performing essentially the same task of claim construction as courts perform today. When the judge then left it for the jury to clarify the ambiguity as to just what elements the claims encompassed, he recognized the existence of a jury question precisely the same as that which the court rejects today.

Even if it were correct that the 1870 Act created a new and different claiming requirement out of whole cloth, I see no evidence that Congress thereby intended to strip the jury of its traditional role in determining patent scope. Indeed, the Seventh Amendment's command that we preserve jury trial rights as they existed at common law dictates that Congress could not have taken the question from the jury even if it wanted to. *See Granfinanciera,* 492 U.S. at 51, 109 S.Ct. at 2795 (Congress "lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury"; private rights involve "the liability of one individual to another under the law as defined" (quoting *Crowell v. Benson,* 285 U.S. 22, 50, 52 S.Ct. 285, 292, 76 L.Ed. 598 (1932))).

Cases involving patent interpretation in the validity context reach the same result.[7] For example, in *Bischoff v. Wethered,* 76 U.S. (9 Wall.) 812, 19 L.Ed. 829 (1869), the Court explained that although it was normally the "province of the court, and not the jury, to construe the meaning of documentary evidence," the "specifications of patents for inventions are documents of a peculiar kind." *Id.,* 76 U.S. at 815. The Court stated further that inventions, the subjects of patents, "have their existence *in pais,* outside of the documents themselves; and which are commonly described by terms of art or mystery to which they respectively belong; and these

---

7. Cases about patent validity are authoritative on the issue of claim construction. A claim must be interpreted the same for both validity and infringement. *E.g., Smithkline Diagnostics Inc. v.* *Helena Lab. Corp.,* 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988). A claim must be construed before determining its validity just as it is first construed before deciding infringement.

descriptions and terms of art often require peculiar knowledge and education to understand them aright." *Id.* Accordingly, an understanding of the patented invention "is to be properly sought, like the explanation of all latent ambiguities arising from the description of external things, by evidence *in pais,*" outside of the patent document. *Id.* This inquiry "belong[s] to the province of evidence, and not that of construction," and thus falls to the jury. *Id.* at 816.

This illustrates how claim construction may sometimes require the resolution of factual matters before a claim can be authoritatively construed. The exercise is further informed by decisions interpreting analogous instruments, for patents are legal documents like contracts or deeds. *See Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880) (patent as contract); *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917) (patent as deed). The analogies are most apt. A patent can be conceived of as a contract between the inventor and the government. In return for full disclosure of the invention the government gives a monopoly of sorts for a time. The rest of us may be third party beneficiaries of this deal, partaking of the advancement of knowledge the patent represents. Or a patent may be thought of as a form of deed which sets out the metes and bounds of the property the inventor owns for the term and puts the world on notice to avoid trespass or to enable one to purchase all or part of the property right it represents. The public holds a vested future interest in the property. Accordingly, patents should be interpreted under the same rules as govern interpretation of kindred documents. *Merrill v. Yeomans,* 94 U.S. 568, 571, 24 L.Ed. 235 (1877).

The interpretation of a contract or a deed, like a patent, is ultimately a question of law. There is nothing novel about the principle that, in the words of Justice Story, "the interpretation of written documents properly belongs to the Court, and not to the jury." *William & James Brown & Co. v. McGran,* 39 U.S. (14 Pet.) 479, 493, 10 L.Ed. 550 (1840). This principle has been routinely

evoked in the context of contract law. *See Levy v. Gadsby,* 7 U.S. (3 Cranch) 180, 186, 2 L.Ed. 404 (1805) ("the construction of a written evidence is exclusively with the court"); *Goddard v. Foster,* 84 U.S. (17 Wall.) 123, 142, 21 L.Ed. 589 (1872) ("[I]t is well-settled law that written instruments are always to be construed by the court...."); *see also Meredith v. Picket,* 22 U.S. (9 Wheat.) 573, 575, 6 L.Ed. 163 (1824) (interpreting a deed, "[t]he Judges must construe the words of an entry, or any other title paper, according to their own opinion of the words as they are found in the instrument itself").

In light of such emphatic Supreme Court language, one might conclude that the meaning of a contract is first and last a question of law which in no instance should be resolved by a factfinder. But as Justice Story also was careful to point out in *McGran,* "there certainly are cases, in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury for the purpose of carrying into effect the real intention of the parties." 39 U.S. (14 Pet.) at 493.

Story used the facts of *McGran* to illustrate the point. One issue was the meaning of certain words used by the parties in letters which formed an agreement on the sale of cotton. The language was susceptible of more than one interpretation and its meaning would depend on the surrounding circumstances. Therefore, the trial judge properly refused to tell the jury what the letters meant, because to do so would have removed from the jury "matters of fact in controversy before the jury upon which it was exclusively their province to decide." *Id.*

*Goddard v. Foster* similarly held that written instruments are for the court "except when they contain technical words, or terms of art, or when the instrument is introduced in evidence collaterally, and where its effect depends not merely on the construction and meaning of the instrument, but upon extrinsic facts and circumstances, in which case the inference to be drawn from it must be left to the jury." 84 U.S. (17 Wall.) at 142. *See also Reed v. Proprietors of Locks & Canals*

*on Merrimac River,* 49 U.S. (8 How.) 274, 289, 12 L.Ed. 1077 (1850) (allowing jury to interpret vague or ambiguous deed, where "it necessarily becomes a fact for the jury to decide, whether the land in controversy is included therein").

The principle that documentary interpretation is a matter of law has become a basic tenet of modern contract law. Equally established, however, is the caveat that extrinsic evidence, such as custom and usage of the trade and course of dealing between the parties, akin to prior art, level of skill in the art, and events in the Patent Office, may be introduced to inform the meaning of terms in the contract. And when such evidence is brought in and creates a real conflict, it results in a question of fact for the jury. *Great N. Ry. Co. v. Merchants Elevator Co.,* 259 U.S. 285, 292, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922); *cf. Reed,* 49 U.S. (8 How.) at 290 (meaning of deed). This is true even though in some circumstances the factual exercise of assigning meaning to a term of a contract serves to decide the meaning of the contract. Until today, the same rule has applied in the interpretation of patents.[8]

RADER, Circuit Judge, concurring in the judgment.

The result in this case is the same whether or not claim construction may sometimes involve subsidiary fact issues. In this case, the claims, specification, and prosecution history irrefutably show that cash transaction totals are not "inventory." Inventor Markman's "after-the-fact testimony" to the contrary "is of little weight compared to the clear import of the patent disclosure itself." *North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1577, 28 USPQ2d 1333, 1337 (Fed. Cir.1993), *cert. denied,* —— U.S. ——, 114

S.Ct. 1645, 128 L.Ed.2d 365 (1994). The testimony of Markman's patent law expert is not evidence at all. *Cf. Nutrition 21 v. United States,* 930 F.2d 867, 871 n. 2, 18 USPQ2d 1347, 1350 n. 2 (Fed.Cir.1991). In sum, the record lacks substantial evidence supporting Markman's asserted claim interpretation. Thus, the trial court correctly granted judgment as a matter of law that Westview did not infringe. *See Read Corp. v. Portec, Inc.,* 970 F.2d 816, 821, 23 USPQ2d 1426, 1431 (Fed.Cir.1992).

To dispose of this case, this court need not decide whether subsidiary fact issues may sometimes arise. Markman cannot manufacture a fact issue where none exists. This court's extensive examination of subsidiary fact issues is dicta.

In commenting on this concurrence, the court claims that whether claim construction can involve subsidiary fact issues "is before us and it is our obligation to decide it." The court, however, neglects the logically antecedent question of whether substantial evidence supports the jury finding rejected by the trial court. *See Read,* 970 F.2d at 821. Where, as here, substantial evidence does not support the finding, it does not matter whether the issue is one of law or fact.

Whether claim construction can involve subsidiary fact issues is *not* before us. It is our duty *not* to rule on this question. The court should decline to answer a question better left to a case that truly raises it, and therefore provides an informed basis for its resolution.

Transaction totals are not, as a matter of law, "inventory." Westview infringes only if transaction totals are "inventory." Therefore, the district court correctly granted

8. After emphasizing that patents are construed according to the same rules that apply to other legal instruments, the court decides that a patent is like a contract or a deed in the context of disputes over its creation or its validity, but that when it comes to the question of infringement, a patent is like a statute. Wholly aside from the metaphysical implications of this curious duality to the traditional rule that patents are interpreted for validity just as they are for infringement, it is simply a bogus analogy.

Patents cannot be baby statutes because they are prepared *ex parte* by interested parties, drafted in the lower reaches of an executive department, and issued ministerially by a political officer. They have none of the indicia of a real statute, but the court imbues them with a transconstitutional power to compromise the role of juries in the third branch of government. Not even a congressionally passed, presidentially signed law can match that. *See Granfinanciera S.A. v. Nordberg,* 492 U.S. 33, 51, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989).

judgment as a matter of law that Westview does not infringe. I concur in the judgment.

PAULINE NEWMAN, Circuit Judge, dissenting.

# I

## INTRODUCTION

The issue is the role of the jury in patent infringement cases. The majority opinion resolves the issue by designating, as law, factual disputes about the meaning and scope of the technologic terms and words of art used to define patented inventions. By holding that these disputed technologic questions are matters of law, the court holds that issues of patent infringement, previously triable to a jury as of right, will now be decided by the trial judge and then re-decided *de novo* by this court on appeal.

Patent infringement is a factual question. Its resolution often requires finding the factual meaning and scope of the terms of scientific art and technology and usage by which the patentee described and claimed the invention. These findings usually require testamentary and documentary evidence and occasionally experiments or demonstrations, as illustrated in many of our previous decisions that are now overruled.

Deciding the meaning of the words used in the patent is often dispositive of the question of infringement. Thus in the case at bar the infringement controversy is decided by finding the meaning and scope of the term "inventory" in Markman's patent, in light of the accused Westview system: if "inventory" is limited to clothing, the patent is not infringed; if "inventory" includes invoices, it is. The majority holds that this is a matter of law, devoid of any factual component; and subject to *de novo* appellate determination. The jury is eliminated, and new and uncertain procedures are imposed on trial judges.

This holding not only raises a constitutional issue of grave consequence, but the court creates a litigation system that is unique to patent cases, unworkable, and ultimately unjust. Thus I must, respectfully, dissent.

I shall discuss three principal concerns:

## 1. The Meaning of Disputed Technologic Terms and Words of Art

Patents are technologic disclosures, written by and for the technologically experienced: those "of skill in the art." The meaning and scope of the terms that define the patented technology is often in dispute in infringement litigation, for it often decides the case. In resolving such dispute the trier of fact often makes findings that depend on the weight, credibility, and probative value of conflicting evidence, such as that offered on behalf of Markman and Westview. Heretofore, the disputed meaning of technologic terms and words of art has been treated by Federal Circuit precedent as an "underlying fact" on which the legal effect of the patent is based. The majority now simply rules that these are not "underlying factual inquiries." However, the meaning and scope of disputed technologic and other terms of art in particular usage are classical questions of fact. Their nature as fact does not change because their finding, like most findings in litigation, has a legal consequence. By redesignating fact as "law" the court has eliminated the jury right from most trials of patent infringement.

## 2. The Trial and Appellate Roles in Technologic Disputes

The trial process is the vehicle for determining truth. Thus the trier of fact is present in the courtroom along with the witnesses, the advocates, the exhibits, and the demonstrations. Indeed, when the technologic issues are complex, appellate fact finding is probably the least effective path to accurate decisionmaking. And if a factual question is technologically simple, it is not thereby transformed into a matter of law and removed from the trial process. Even were there no constitutional infirmity, I doubt that the correct resolution of technologic or scientific disputes is more likely to be achieved by removing disputed facts from the procedures of trial and consigning them to the appellate court. Appellate briefs and fifteen minutes per side of attorney argument are not designed for *de novo* findings of disputed technologic questions.

### 3. The Constitution

Jury trial in patent cases is protected by the Seventh Amendment. Elimination of the jury is not this court's choice to make.

The constitutional right alone bars the majority's new rule. The majority today denies 200 years of jury trial of patent cases in the United States, preceded by over 150 years of jury trial of patent cases in England, by simply calling a question of fact a question of law. The Seventh Amendment is not so readily circumvented.

## II

### FACT AND LAW IN PATENT INFRINGEMENT

#### A. LEGAL "CONSTRUCTION" v. FACTUAL "INTERPRETATION"

The majority's explanation for removing these factual issues from the jury is that it is "construing" the patent claims, and that the "construction" of documents is a matter of law. The legal construction of documents—patent documents and other documents—is indeed a matter of law. The legal effect of the patent claim is to establish the metes and bounds of the patent right to exclude; this is a matter of law. But this does not deprive the underlying facts of their nature as fact. These facts are found on evidence that includes the patent specification, relevant prior art, the prosecution history, the testimony of experts in the field, and other relevant evidence such as tests and demonstrations, all as I shall discuss *post.* These findings do not become rules of law because they relate to a document whose legal effect follows from the found facts.

An extensive body of law, statutory and judgemade, governs the construction and legal effect of patent claims; for example, that a claim is construed the same way in determining both patent validity and infringement; that a dependent claim includes all of the limitations of the independent claim; that the claims as filed are part of the technical disclosure; that the right to exclude is divisible into making, using, or selling the claimed subject matter; that a claim is not infringed unless every element thereof is met in the accused device, either literally or by an equivalent. These and other rules of law are applied when appropriate to the facts of the particular case: either undisputed facts, or facts that are found by the trier of fact. The procedure of applying law to facts does not convert the finding of facts into a matter of law.

In patent infringement litigation there is often a factual dispute as to the meaning and scope of the technical terms or words of art as they are used in the particular patented invention. When such dispute arises its resolution is not a ruling of law, but a finding of fact. Such findings of meaning, scope, and usage have been called the "interpretation" of disputed terms of a document, as contrasted with the "construction" or legal effect of a document. Professor Corbin has explained this distinction, in the context of contracts, as reflecting the difference between "language" and the "legal operation" of language:

> It may be helpful to note that the word interpretation is commonly used with respect to *language* itself—to the symbols (the words and acts) of expression. In about the same degree, we speak of the construction of a *contract.* It is true that we also speak of construing language and of interpreting a contract; but by the latter phrase is certainly meant interpreting the *words* of a contract. The word "contract" has been variously defined; but it is seldom identified with mere symbols of expression. By "interpretation of language" we determine what ideas that language induces in other persons. By "construction of the contract," as that term will be used here, we determine its legal operation—its effect upon the action of courts and administrative officials.

3 Arthur L. Corbin, *Corbin on Contracts* § 534 (1960) (footnotes omitted). The *Restatement (Second) of Contracts* § 200 and Comment c (1981) describes the distinction between "construction" and "interpretation" as reflecting the difference between the "meaning" of a term and its "legal effect":

> Interpretation of a promise or agreement or a term thereof is the ascertainment of its meaning.

\*　　\*　　\*　　\*　　\*　　\*

Interpretation is not a determination of the legal effect of words or other conduct.

The Reporter's Note explains that the purpose is "to make it clear that 'interpretation' relates to meaning and to avoid confusion with the ascertainment of legal operation or effect, sometimes called 'construction.'" (Citations omitted.) The analogy is apt, although a patent is not a contract, for this distinction has been recognized for many kinds of written instruments. *See, e.g., In re XTI Xonix Technologies Inc.*, 156 B.R. 821, 829 n. 6 (D.Ore.1993) (proceeding in bankruptcy):

Interpretation and construction of written instruments are not the same. A rule of construction is one which either governs the effect of an ascertained intention, or points out what the court should do in the absence of express or implied intention, while a rule of interpretation is one which governs the ascertainment of the meaning of the maker of the instrument.

*Williams v. Humble Oil & Ref. Co.*, 432 F.2d 165, 179 (5th Cir.1970), *cert. denied*, 402 U.S. 934, 91 S.Ct. 1526, 28 L.Ed.2d 868 (1971) (contract):

In the law of contracts (conventional obligations) a proper distinction exists between the "interpretation" of written instruments and their "construction." "Interpretation" refers to the process of determining the meaning of the words used; that process is traditionally thought to be a function of the jury. On the other hand, the process of determining the legal effect of the words used—once we know their meaning—is properly labelled "construction"; it is peculiarly a function of the court.

*Hornick v. Owners Ins. Co.*, 511 N.W.2d 370 (Iowa 1993) (insurance policy):

Construction of an insurance policy—the process of determining its legal effect—is a question of law for the court. Interpretation—the process of determining the meaning of words used—is also a question of law for the court unless it depends on extrinsic evidence or a choice among reasonable inferences to be drawn.

*In re Union Trust Co.*, 89 Misc. 69, 151 N.Y.S. 246, 249–50 (Sur.Ct.1915) (will):

A rule of construction is one which either governs the effect of an ascertained intention or points out what a court should do in the absence of express or implied intention. A rule of interpretation is one which governs the ascertainment of the meaning of the maker of a written document.

*Reed v. Proprietors of Locks & Canals on Merrimac River*, 49 U.S. (8 How.) 274, 288–89, 12 L.Ed. 1077 (1850) (deed):

It is true, that it was the duty of the court to give a construction to the deed in question, so far as the intention of the parties could be elicited therefrom.... But after all this is done, it is still a question of fact to be discovered from evidence dehors the deed ... for the jury to decide, whether the land in controversy is included therein, or, in other words, was *intended* by the parties so to be.

It is indeed well understood that the legal effect or construction of the terms of a document, a matter of law, is not to be confused with resolution of disputes concerning the factual meaning of the terms. The former is for the court, the latter for the jury. That the thing whose terms require interpretation is a patent, instead of a deed or a will or a contract, does not convert the finding of disputed facts into a matter of law. Factual findings concerning a particular patented invention do not become matters of law simply because the patent document serves a legal purpose.

Although purity of language has occasionally slipped, for the words "construction" and "interpretation" have been loosely used, the distinction between the concepts has been recognized when it mattered. For example, Walker in his 1904 *Textbook* used the phrase "construction of the patent," but he left no doubt as to the role of the jury as trier of fact:

[W]here the question of infringement depends on the construction of the patent, and that construction depends upon a doubtful question in the prior art, the latter question should be left for the jury; and the dependent question of infringement should also be left for the jury to decide.

A.H. Walker, *Textbook on the Patent Laws of the United States of America* § 536 (4th ed. 1904).

This recognition that the factual issues that underlie the "construction of the patent," and that determine patent infringement, are for the jury is manifest even in the early Supreme Court cases that are relied on by the majority, as I discuss in Part IV–C, *post.* The majority's authority does not show removal of factual disputes from the jury. Indeed, several of the cases that are relied upon were bills in equity, and irrelevant to jury trials.

## B. EVIDENCE RELEVANT TO CLAIM INTERPRETATION

The areas of evidentiary inquiry commonly encountered in patent infringement cases are illustrated in Markman's case. The infringement trial (validity and damages were severed) included evidence relating to the patent specification, the patent claims, the prosecution history, the inventor's usage of "inventory," and the defendant's understanding of the term. Although Markman's invention was not complex, this phase of the trial took three days.

### 1. The Specification

The patent specification contains the description of the invention, including the claims. It fulfills the inventor's obligation to make known the technology for which the patent is granted, and must meet certain legal requirements. It must be written, and clear. It must be complete yet concise. It must enable one of skill in the field to make and use the invention, but need not include that which is known to the field. It must describe the best mode known to the inventor. It is a technical document, written for persons experienced in the technology. *See* 2 Irving Kayton et al., *Patent Practice* 9–1 to 9–3 (4th ed. 1989) (describing thirteen functions of the patent specification).

The claims are part of the specification. Their purpose is to identify—"particularly pointing out and distinctly claiming," 35 U.S.C. § 112—that which is the subject of the patent grant. Patent claims are terse summaries, and do not repeat the technologic content of the specification. When there arises a question as to whether a term in a patent claim is of a meaning and scope that reaches particular subject matter, the interested public and in turn the courts look to the body of the specification for elaboration and illustration of the usage of the term to define the patented technology.

When litigation ensues, it may be helpful to the trier of fact to hear from the inventor what he/she meant by the terms of art and science and technology used to describe the invention. Markman, as the inventor, testified on this aspect. It may also be helpful to hear, from others in the field of the invention, what was conveyed to them by the now-disputed terms. Markman's witness and Westview's president so testified. Not unexpectedly, the evidence was conflicting. The trier of fact may have to assess the technical content, weight, and credibility of all of the evidence, including but not limited to the specification, in finding the meaning and scope of disputed terms as used in the patent. Whether the term "inventory" in Markman's Claim 1 includes Westview's invoices can not be found in the abstract, nor by consulting a dictionary; it is found on the evidence of this case, for the specific invention and the specific accused system. This has historically been a question of fact.[1]

The Federal Circuit has explained the relationship between law and fact in claim interpretation in many cases, all now overruled, as I illustrate in Part IV–A, B, *post.* For example, in *Perini America, Inc. v. Paper Converting Mach. Co.*, 832 F.2d 581, 4 USPQ2d 1621 (Fed.Cir.1987) the patented invention related to machines having embosser rolls

---

1. The Federal Circuit, finding this fact *en banc*, holds that the inventor Markman's testimony is "of little or no probative weight" to explain his invention, apparently because he was represented by an attorney before the patent office. The majority states that it is "not unusual" for the inventor not to know what his attorney has pat-

ented. Maj. op. at 986. This will be a revelation to the nation's patentees. The majority earlier in its opinion "rejects" Markman's testimony, maj. op. at 983, apparently based on its weight, a question of fact, not on its admissibility, a ruling of law.

used in manufacturing paper towels. Typical of the technologic terms in dispute was "the projections in one web intermediate the projections in the other web" to describe the alignment of the embosser rolls. This court recognized that the meaning of this term was a factual issue, and explained that claim interpretation rests on underlying facts:

> Like all legal conclusions, that conclusion [that a claim must be interpreted in a certain way] rises out of and rests on a foundation built of established (undisputed or correctly found) facts. Interpretation of a claim, or of its scope, should not be assayed until a foundation is in place. If the meaning of terms in the claim, the specification, other claims, or prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin.

*Id.* at 584, 4 USPQ2d at 1624. The court observed that the finding of disputed facts can "dictate" the ultimate conclusion of what the claim means:

> Confusion may be caused by the circumstance in which resolution of the question of the meaning of a term or terms dictates the interpretation of the claim, but that is not unusual, legal conclusions being dictated by established facts and not the other way around, and does not change the nature of the meaning-of-terms inquiry from one of fact to one of law.

*Id.* The majority now criticizes and expressly overrules these statements in *Perini,* holding that these facts are not fact, but "law," and that they are removed from the trier of fact and are determined *de novo* on appeal. In my view the *Perini* court's analysis is in accord with precedent, and properly preserves the role of the trier of fact, whether trial is to the bench or to a jury.

### 2. Prior Art

When there is a dispute as to the meaning and scope of a technologic term or word of art in a patent claim, it is often helpful to look at the prior art: that is, what was known to persons in the field of the invention at the time the invention was made. The scope and content of the prior art, the differences between the claimed invention and the prior art, the level of ordinary skill in the field of the invention, are all questions of fact, *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), and are not subject to reclassification by us.[2]

The prior art may provide evidence of how the disputed technologic terms and words of art or science were used by others in the field of the invention, and thus evidence of what was conveyed to the field by the terms as used by the patentee. Indeed, the infringement analysis can sometimes stop with the prior art, for if the accused device is found in the prior art, then it is a rule of law that the patent claims can not be interpreted to reach that device. This too requires findings of the scope and content of the prior art, a question of fact, *Graham v. John Deere,* that is found with an eye upon the accused device.

I do not attempt to catalogue the myriad kinds of information, findings, and inferences that may flow from the prior art, in determining the technologic scope of the patentee's invention. This evidence, and the findings and inferences that are drawn, are the province of the trier of fact. The majority's insistence that these are purely legal matters of "claim construction" does indeed serve to replace the trier of fact with the Federal Circuit; I doubt that it improves the quality of the decision, at great cost to efficiency of the trial/appellate process.

### 3. The Prosecution History

The prosecution history is the record in the Patent and Trademark Office of what transpired during examination of the patent application. It is a public record. It sometimes is lengthy and detailed, sometimes

---

**2.** In *Graham v. John Deere* the Court described the issue of "obviousness" in patent cases as one of law based on underlying facts. An analogous pattern has heretofore applied in connection with "claim construction", *i.e.,* as a question of law based on underlying facts. I suggest that these ultimate questions have a strong policy component, and that the Federal Circuit's responsibility for imparting consistency to patent decisions is a significant factor in the law/fact dichotomy.

sketchy and brief. The prosecution history may provide evidence of how the inventor or the patent examiner viewed the now-disputed technologic and other terms. In *Howes v. Medical Components, Inc.*, 814 F.2d 638, 645, 2 USPQ2d 1271, 1274–75 (Fed.Cir.1987) this court observed that "during the prosecution of a patent, claim language may take on new meanings, possibly different from that which was originally intended." The way patentability was argued by the inventor, concessions made or positions adjusted, may be relevant to the factual issue in dispute, and may create an estoppel against the patentee's now-proposed interpretation.

The determination of what occurred in the prosecution of the patent application is a factual matter, *Smithkline Diagnostics Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 882, 8 USPQ2d 1468, 1471–72 (Fed.Cir.1988), specific to the particular patent. It is often based on technological arguments, experimental evidence submitted to the patent office, discussions of the meaning and relevance of prior publications and prior knowledge, explanations of the technical content of the specification, and other evidence of the applicant's and the examiner's positions. This evidence, and appropriate findings and inferences, are for the trier of fact.

The majority refers to the "undisputed" prosecution history, in asserting that there are no factual aspects to this evidence. Indeed, the official government record is fixed. But the significance of the exchanges, compromises, and explanations contained in the correspondence between the inventor and the examiner; the inferences to be drawn as to the technology, the invention, and the meaning and scope of now-disputed technologic terms or words of art; may depend on this and other evidence. If disputed, their finding is for the trier of fact. The meaning, significance, and weight of the content of a documentary record does not become a matter of law simply because the content of the record is not in dispute.

### 4. *Technologic/Scientific Facts*

Decision of the question of patent infringement usually turns on findings of technologic fact; sometimes relatively simple technology, sometimes at the frontier of scientific advance and its practical applications. When scientific and technologic disputes arise in litigation, they are subject to the rules of evidence and procedure. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (discussing issues of scientific evidence). The complexity of the technologic/scientific evidence will of course vary with the issue. *See, e.g., Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 24 USPQ2d 1401 (Fed.Cir.1992) (color video display semiconductor chips); *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 18 USPQ2d 1001 (Fed.Cir.1991) (blood clotting factor VIII); *Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 17 USPQ2d 1834 (Fed.Cir.1991) (neutron logging of oil wells); *Bey v. Kollonitsch*, 806 F.2d 1024, 231 USPQ 967 (Fed.Cir.1986) (irreversible enzyme inhibitors); *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 225 USPQ 26 (Fed.Cir.1985) (silicated lithography plates).

The Court stressed in *Daubert* that the admissibility of scientific evidence depends on its reliability and relevance, and that the judge's responsibility, when the trier of fact is a jury, is to assure the adequacy of the methodology upon which the evidence is based. —— U.S. at ——–——, 113 S.Ct. at 2795–96. This emphasis on methodology is as well suited to practical applications of technology and engineering as to basic scientific principles. Evidence in patent cases is often provided by scientists or engineers as expert witnesses, and may include explanations of the technology and its scientific basis, comparisons with the prior art or with the accused device, experiments, demonstrations, and interpretations. The evaluation of technologic evidence is often required of the trier of fact. *See* Lee Loevinger, *Science as Evidence*, 35 Jurimetrics J. 153 (1995); Jack B. Weinstein, *The Effect of Daubert on the Work of Federal Trial Judges*, 2 Shepard's Expert and Scientific Evidence Quarterly 1 (1994).

Nor is it rare in patent cases to encounter incomplete data, theoretical uncertainties, untested inferences, and speculative conclu-

sions. Experimental procedures, the sources of data, and the bases of opinions that are offered to prove/disprove a technologic fact are often in evidentiary conflict in patent disputes. Engineers and scientists know very well the uncertainties of the experimental process, the fluctuations and glitches in the data, the human and machine error, the forks in the road to objective truth. Indeed, understanding of the fallibility of technologic and scientific experimentation is soon acquired by those who labor in the field of litigation. "The community of trial lawyers and judges knows perhaps better than any other professional group just how unruly science often is in practice." Sheila Jasanoff, *What Judges Should Know About the Sociology of Science,* 77 Judicature 77, 80 (1993) (discussing the "social dimension [that] gives legitimacy to particular scientific 'facts' ").

Now that the Federal Circuit holds that resolution of disputes as to the meaning and scope of technologic terms and words of art as used in a particular patent is law, not fact, removing the jury from this issue, is the trial judge excused from determining the admissibility and relevance of technologic evidence? What about the requirement that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In a patent case the trier of fact may receive extensive evidence related to the meaning and scope of technologic or scientific terms or words of art, their usage and their perception in the field of a particular invention. The evidence often includes technical publications, scientific articles, experimental data, demonstrations, and opinion testimony. The factual nature of such evidence can not be squared with the majority's criticism of such cases as *Palumbo v. Don–Joy,* 762 F.2d 969, 226 USPQ 5 (Fed.Cir.1985), which is today overruled for its holding that "when the meaning of a term in a claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises." *Id.* at 974, 226 USPQ at 8. In addition to my concern about how a record will be developed for the Federal Circuit's *de novo* decision, I

doubt that an appellate court's *de novo* finding of technologic facts is more likely to attain accuracy, than the decision of a jury or judge before whom a full trial was had:

> Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.

*Anderson v. City of Bessemer City,* 470 U.S. 564, 574–75, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985).

### 5. The Testimony of Experts

Disputed questions of the meaning and scope of technologic terms and words of art are decided from the viewpoint of persons of skill in the specific field of technology. It is rare to come upon a technologic issue in litigation for which differing and often plausible views are not offered by qualified witnesses. The Federal Rules of Evidence contemplate the provision of specialized knowledge to assist the trier of fact:

> **R. 702.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto....

In *Moëller v. Ionetics, Inc.,* 794 F.2d 653, 229 USPQ 992 (Fed.Cir.1986) this court held that the trial court's rejection of expert testimony in that case was an abuse of discretion:

> Although use of experts is generally a matter of discretion with the trial judge, that discretion is not unlimited. In a patent case involving complex scientific principles, it is particularly helpful to see how those skilled in the art would interpret the claim.

*Id.* at 657, 229 USPQ at 995 (citations omitted). In *Moeller* the claims related to an electronic process for measuring the concentration of cations, the dispute centering on the particular meaning of the term "electrode body." *Moeller* too is now criticized and overruled for its statement that

> although claim construction is a legal question, underlying fact disputes may arise

pertaining to extrinsic evidence that might preclude summary judgment treatment of claim construction.

*Id.* (citation omitted). I do not see how the Federal Circuit could have decided, *de novo* on appeal, the meaning of "electrode body" in this particular invention without finding disputed technologic facts.

The majority's stated recognition that expert testimony may be useful, while holding that "extrinsic evidence of record cannot be relied on to change the meaning of the claims," majority op. at 998, denying all deference to the trier of fact's findings based on that evidence, illustrate the confusion in the court's plan of *de novo* claim interpretation as a matter of law. The majority has created a procedural quandary, for extrinsic evidence can apparently be received, but no jury can weigh it. When the extrinsic evidence is in conflict—as it invariably is—what then? Will the Federal Circuit itself weigh the evidence of expert witnesses? Will we receive a collection of self-serving affidavits, without examination and cross-examination? Such a procedure surely is not optimal for cases that may require decision of complex engineering or electronics, or chemical or biological processes.

The Court in *Daubert* referred to the value of the adversary system in matters of scientific proof. The cross-examination of technical experts, with the adversarial guidance of other technical experts, can be as rigorous as any "peer review" process. *See generally* Margaret A. Berger, *Procedural Paradigms for Applying the Daubert Test*, 78 Minn. L.Rev. 1345 (1994). In resolving litigation controversy by determining mechanical or chemical or electronic truth, it is hard to understand why justice should be handicapped in the Federal Circuit by replacement of a live trial with cold documents.

In eliminating all sources of "fact" that might implicate the jury right, the majority has denied to the trial of patent cases the assistance that Federal Rule of Evidence 702 is designed to provide, as well as the benefits of Rules 403, 703, and 706. The purpose of these rules is "that the truth may be ascertained and proceedings justly determined." Fed.R.Evid. 102. It seems to me that we have constructed a Hobson's choice whereby either (1) there will indeed be factual evidence of technologic meaning entered into the trial record, for *de novo* decision on the record by the Federal Circuit, (2) there will be scant evidence admitted at trial, in view of our pronouncement that there is only law in claim interpretation. Either way, one might call this the "omniscience of the learned man" theory of dispute resolution in the Federal Circuit.[3]

Findings of the meaning of technologic terms and words of art in particular usages are the province of the trier of fact. Discussing words and their jurisprudential treatment, Justice Holmes wrote:

> A word is not a crystal, transparent and unchanged; it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used.

*Towne v. Eisner*, 245 U.S. 418, 425, 38 S.Ct. 158, 159, 62 L.Ed. 372 (1918). In *Autogiro Co. of America v. United States*, 384 F.2d 391, 397, 181 Ct.Cl. 55, 155 USPQ 697, 702 (1967) one of our predecessor courts remarked: "The very nature of words would make a clear and unambiguous [patent] claim a rare occurrence." Justice Story explained the roles of judge and jury with respect to the meaning of "words of art, and technical phrases" in patent documents:

> In respect to another objection, viz. that the court was bound to state what in point of law the invention claimed by the patentee was, I agree, that this is generally true, so far as the construction of the words of the patent, and specification is concerned. But then this doctrine is to be received with qualifications, and sub modo, as the very opinion of Mr. Baron Parke, cited by the counsel, in the case of *Neilson v. Harford*, Webster Pat.Cas. 295, 370,[4] abundantly shows; and *the jury are to judge of*

---

**3.** Nathan Isaacs, *The Law and the Facts*, 22 Colum.L.Rev. 1, 13 (1922) (warning courts of "medieval assumptions as to the omniscience of the learned man").

**4.** English patent cases were cited by United States courts well into the nineteenth century.

*the meaning* of words of art, and technical phrases, in commerce and manufactures, and of the surrounding circumstances, which may materially affect, enlarge or control the meaning of the words of the patent and specification.

*Washburn v. Gould*, 29 F.Cas. 312, 325 (C.C.D.Mass.1844) (emphasis added). Justice Story recognized that the meaning of words of art may depend on "the surrounding circumstances." Indeed, the Federal Circuit recognized that words do not always have the same meaning when they are adapted to new uses. *See Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983) (patentee may be his own lexicographer).

Inventors' usages of words to describe their inventions, and the meaning thereby conveyed to persons skilled in the field, are questions of fact, not matters of law, in patent documents as in other written instruments. Disputes concerning the meaning and usage of technical terms and words of art arise in many areas of law. These disputes are resolved by the triers of fact, whether judge or jury, in their established roles in the adjudicatory process. For example, the role of the jury with respect to technical terms in a contract for drilling oil wells was explained in *Startex Drilling Co. v. Sohio Petroleum Co.*, 680 F.2d 412 (5th Cir. 1982):

> It is more apt to say that the undefined technical terms on which the contract's application to the present dispute depends convey little meaning without explanation. So, while we agree with Sohio that we are free to determine the ambiguity question anew, we also affirm the district court's ruling that the contract is ambiguous. Thus it was proper to submit to the jury the evidence from both sides as to the meaning attached to these technical terms by the parties, and by the industry.

*Id.* at 415 (citation omitted). In *Zell v. American Seating Co.*, 138 F.2d 641 (2d Cir. 1943), Judge Frank wrote for the court that:

> Thayer delightfully described the fatuous notion of a "lawyer's Paradise, where all words have a fixed, precisely ascertained meaning; where men may express their

purposes, not only with accuracy, but with fullness; and where, if the writer has been careful, a lawyer, having a document referred to him, may sit in his chair, inspect the text, and answer all questions without raising his eyes."

*Id.* at 648 n. 26 (quoting Thayer, *A Preliminary Treatise on Evidence* (1898)).

It has not heretofore been seriously challenged that findings of the weight and credibility of evidence are for the jury, whether the issues are technologic, scientific, or otherwise. *See Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944):

> [The weight and credibility of a witness' testimony] "belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men; and so long as we have jury trials they should not be disturbed in their possession of it, except in a case of manifest and extreme abuse of their function."

*Id.* at 628, 64 S.Ct. at 729 (quoting *Aetna Life Ins. Co. v. Ward*, 140 U.S. 76, 88, 11 S.Ct. 720, 724, 35 L.Ed. 371 (1891)). In *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 220 USPQ 929 (Fed.Cir.), *cert. denied*, 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984) this court instructed a party who sought *de novo* appellate review after a jury trial:

> Thus [Railroad Dynamics] misconceives our role as an appellate court. In the concert hall of justice, each musician has a part to play. When one on whim plays not his own but another's part, discord is certain. Moreover, our parts are played under well defined rules.

*Id.* at 1514, 220 USPQ at 937.

Implementing this court's departure from the established appellate role, in reviewing Markman's case on this appeal the majority does not mention the jury instructions, or discuss whether a reasonable jury could have reached the verdict that was reached on the evidence adduced, or decide whether there was substantial credible evidence of such content and weight as could support the jury's verdict. The majority finds for itself

the disputed fact of whether the term "inventory" includes the invoices of the Westview system, without any deference to the trial process. Whether or not this court believes that it is a superior finder of technologic fact, that is not our place in the judicial structure.

I wonder how this new system will work. The majority states that the trial judge should have decided the meaning of "inventory" before giving the case to the jury,[5] but that the error was harmless since the trial judge reached the correct meaning "as a matter of law" after the jury verdict. There was no return to the jury after the trial judge re-decided what "inventory" meant, making the jury superfluous. The Federal Circuit now decides *de novo* whether "inventory" includes "invoices," ignoring the trial. What of the trial process, if trial judge and jury are ciphers upon appellate review? In the Introduction to the *Reference Manual on Scientific Evidence* (1994), Judge Schwarzer wrote:

> The bedrock of [the justice] system is the adversary process, which depends on attorneys to present evidence on behalf of their clients, judges to make the necessary and appropriate rulings concerning admissibility, and juries to resolve disputed issues of fact.

*Id.* at 1.

In patent cases, no less than for other causes of action, it is the trier of fact on whom the system of justice is founded. The extensive exposition of disputed facts that is available at trial can not be duplicated on appeal. Even were there no constitutional infirmity, I can discern no practical benefit sufficient to justify this court's departure from the established procedures of trial and appeal. Implicit in the appellate process is an expected degree of deference to the trial process. The majority's elimination of the jury as trier of fact, and elimination of the deference owed to the judge upon bench trial of disputed facts, removes from the parties the benefit of the trial process. It distorts the trial/appellate relationship in a manner unique to patent litigation, and manifests a heady misperception of our assignment as a national appellate court.

## C. THE "CLASSIFICATION POWER"— TURNING FACT INTO LAW

Commentators have remarked on the temptation of appellate courts to redefine questions of fact as questions of law in order to impose the court's policy viewpoint on the decision. Professor Martin Louis calls the appellate assertion of power to treat fact as law "drastic in that it amounts to a direct judicial assault on the prerogatives of fact finders." Martin B. Louis, *Allocating Adjudicative Decision Making Authority Between the Trial and Appellate Levels: A Unified View of the Scope of Review, the Judge/Jury Question, and Procedural Discretion,* 64 N.C.L.Rev. 993, 1018 (1986). Louis observes that the "classification of ultimate facts as questions of law amounts to a manipulation of the law-fact doctrine to take questions from the jury or to subject the trial level's resolution of questions to free appellate review." *Id.* at 1028. Although the Seventh Amendment has provided a safe-

---

5. Attempting to understand how this procedure would work for complex technologies, at the *en banc* argument I inquired of Westview's counsel:

J. Newman: If the claim is sufficiently complex—technologically or just complex in general—that the judge can't decide what it means without taking testimony, hearing the experts, hearing the inventor, hearing whatever else it is that each side needs to, wants to, adduce that the judge permits ... I can envision, can't you, that a judge would have to hold some kind of evidentiary hearing, at least, if not a mini-trial, in order to learn enough about the claim to decide, as a matter of law, disputed issues?

Mr. Griffin: Yes your honor.

J. Newman: We are assuming the issues are disputed, that this is not just a matter of explanation, but a matter of requiring a choice between one side's viewpoint and another. And that the judge should then have a preliminary trial to decide what the claim means by making whatever choices need to be made, and then tell the jury: "Take it from here now, apply this to the accused device"?

Mr. Griffin: Yes your honor.

J. Newman: That is quite unusual, is it not? Have you seen this done?

Mr. Griffin: Personally no your honor.

J. Newman: I wonder how the trial judges would take to that.

Mr. Griffin: Probably would not like it your honor, because that would impose a burden which in most cases can be avoided.

guard against this autocracy of the judiciary, concerned observers have long counselled vigilance. Thus definitions of fact and law—the methodology of this appellate power—have attracted the attention of legal scholars.

"Law" is usually defined as a statement of the general principle or rule, predicated in advance, awaiting application to particular facts as they may arise. *See* Francis H. Bohlen, *Mixed Questions of Law and Fact*, 72 U.Pa.L.Rev. 111, 112 (1924). Louis, *supra*, at 994, states the principle:

> Declarations of law are fact-free general principles that are applicable to all, or at least to many, disputes and not simply to the one sub judice.

There is an additional element to "law;" that is, the duty of judicial enforcement. As Professor Thayer explained, "nothing is law that is not a rule or standard which it is the duty of judicial tribunals to apply and enforce." James B. Thayer, *"Law and Fact" in Jury Trials*, 4 Harv.L.Rev. 147, 153 (1890).

Thayer defines "fact" as follows:

> ["Fact"] is what Locke expresses when he speaks of "some particular existence, or, as it is usually termed, matter of fact." The fundamental conception is that of a thing as existing, or being true. It is not limited to what is tangible, or visible, or in any way the object of sense; things invisible, mere thoughts, intentions, fancies of the mind, propositions, when conceived of as existing or being true, are conceived of as facts. The question of whether a thing be a fact or not, is the question of whether it is, whether it exists, whether it be true. All inquiries into the truth, the reality, the actuality of things are inquires into the fact about them.

*Id.* at 151–52. A compilation of definitions of "fact" is provided in *Black's Law Dictionary* 591–92 (6th ed. 1990):

> A thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence; an actual happening in time or space or an event mental or physical; that which has taken place.
>
> . . . .
>
> . . . . "Fact" means reality of events or things the actual occurrence or existence of which is to be determined by evidence.

In sum, the law is a general proposition, while the fact is a case-specific inquiry. Clarence Morris, *Law and Fact*, 55 Harv. L.Rev. 1303, 1304 (1942), observed that a controlling distinction between law and fact is whether evidence is needed, for a question of fact usually calls for proof, whereas matters of law are established not by evidentiary showing but by intellectual abstraction.

These distinctions have often been discussed, usually in the course of considering the complexities that can arise, and how they have been, or should be, treated. Thus commentators and judges have written to explain the distinctions among historical facts, ultimate facts, and mixed law/fact questions, in the course of relating these distinctions to trial procedures and judicial review. The nicety that has been generated was criticized in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 124 USPQ 115 (7th Cir.1960), as follows:

> We have come to speak of questions of "fact," "primary facts," "subsidiary facts," "evidentiary facts," "ultimate facts," "physical facts," "documentary facts," "oral evidence," "inferences," "reasonable inferences," "findings of fact," "conclusions," "conclusions of law," "questions of fact," "questions of law," "mixed questions of law and fact," "correct criteria of law," and so on *ad infinitum*. The simple answer is that we are all too frequently dealing in semantics, and our choice of words does not always reflect the magic we would prefer to ascribe to them.

274 F.2d at 155, 124 USPQ at 124–25 (footnote omitted). *See generally* Steven A. Childress & Martha S. Davis, *Federal Standards of Review* (2d ed. 1992).

The character of what is a fact does not change, even in those special cases that have been held to warrant plenary appellate review.[6] The subject matter that the majority

---

**6.** Among the rare exceptions to deferential appellate review of factual findings are the "constitutional facts", discussed in *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose* the Court cautioned against enlarging its holding

now designates as "law"—the disputed meaning and scope of technologic terms and words of art as used in particular inventions—is not law, but fact. On any definition of fact and law, the question of whether "inventory" as used in Markman's Claim 1 means only clothing or can include invoices is a question of fact: on Thayer's criterion of whether the fact exists; on Morris' criterion of whether there is a need for evidence; on Bohlen's inquiry of whether the meaning is specific to the situation *sub judice*. The meaning of "inventory" is specific to this invention, this patent, this claim, this system, this defendant. Its determination is for the trier of fact.

## III

## THE CONSTITUTION

The most egregious lapse in the majority's ruling is its discard of the jury right in patent cases. As I said at the outset, patent infringement has been tried to a jury in the United States for two hundred years, and in England since at least 1623. Disputes concerning "letters patent" for inventions were tried in the English courts, as for other forms of letters patent, as I shall illustrate. Patent infringement trials at common law included determination of validity as well as infringement. Whatever version of "law/fact" this court now chooses to adopt, it can not redact the history of jury trials. The judicial obligation to safeguard the constitutional right is not defeasible by calling a patent a "statute," or otherwise diminishing the vitality of the Seventh Amendment.

Thus the court, sitting *en banc* to overrule its contrary precedent, removes the jury from its role as the trier of fact. That right is assured by the Seventh Amendment:

> In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

U.S. Const. amend. VII.

The importance of the jury right to the Framers can not be overemphasized. Alexander Hamilton wrote:

> The friends and adversaries of the plan of the convention, if they agree in nothing else, concur at least in the value they set upon the trial by jury; or if there is any difference between them it consists in this: the former regard it as a valuable safeguard to liberty; the latter represent it as the very palladium of free government.

The Federalist No. 83, at 499 (Clinton Rossiter ed., 1961). In discussing the history of the jury in England and in the United States, Judge Arnold has explained:

> It is almost impossible to exaggerate the centrality of the institution of the jury to almost all the important episodes of Anglo–American legal history. Many of the central ideas of the American and English common law owe their origin to the fact that the jury was the chief mechanism for trying factual disputes. It is the single most important institution in the history of Anglo–American law.

Morris Sheppard Arnold, *The Civil Jury in Historical Perspective, in The American Civil Jury* 9, 10 (1987).

The value that the Framers placed on this "palladium of free government" has been guarded by the courts:

> Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.

*Dimick v. Schiedt,* 293 U.S. 474, 486, 55 S.Ct. 296, 301, 79 L.Ed. 603 (1935).

The deference that courts give to jury verdicts is the mechanism by which the Constitution protects the jury right from encroachment by judges. It is not this court's

---

beyond the conflict between constitutional provisions there exemplified. The "constitutional fact" exemplified in *Bose* does not place all facts in the hands of appellate courts for *de novo* finding. Such exceptions to the otherwise firm

rule of deference to the trier of fact have always been narrow. *See generally* Frank R. Strong, *Dilemmic Aspects of the Doctrine of "Constitutional Fact",* 47 N.C.L.Rev. 311 (1969).

option to violate that right, whether by denying such deference or by taking from the jury the trial of factual issues. Whatever one's personal view of the relative capabilities of a jury and the Federal Circuit in finding technologic facts in patent cases, it is not within our authority to readjust that role to our taste:

> The Seventh Amendment ... requires that questions of fact in common law actions shall be settled by a jury, and that the court shall not assume directly or indirectly to take from the jury or to itself such prerogative.

*Walker v. New Mexico & So. Pac. R. Co.*, 165 U.S. 593, 596, 17 S.Ct. 421, 422, 41 L.Ed. 837 (1897).

The Federal Circuit early affirmed its inheritance of this responsibility, as we undertook our assignment to provide nationwide uniformity in patent cases. In *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1547, 220 USPQ 193, 197 (Fed.Cir.1983) the court stated:

> So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases.

In *Railroad Dynamics v. Stucki*, 727 F.2d at 1515, 220 USPQ at 937, the court stated:

> There is, of course, no reason for considering patent cases as somehow out of the mainstream of the law and rules of procedure applicable to jury trials for centuries under our jurisprudence.

In many ensuing decisions we reaffirmed this obligation. However, this court's fidelity to fundamental law slipped in recent years, culminating in today's trivializing of our heritage as we defeat the jury right in patent infringement cases.

## A. THE HISTORICAL TEST

There are no fine lines to be drawn in interpreting the Seventh Amendment, for all cases at common law in England were tried to a jury. In explaining the "historical test,"

Justice Story described England as "the grand reservoir of all our jurisprudence":

> Beyond all question, the common law here alluded to [in the Seventh Amendment] is not the common law of any individual state, (for it probably differs in all), but is the common law of England, the grand reservoir of all our jurisprudence. It cannot be necessary for me to expound the grounds for this opinion, because they must be obvious to every person acquainted with the history of the law.

*United States v. Wonson*, 28 F.Cas. 745, 750 (1812). The historical test assured the largeness of the embrace of the Amendment. I can find no support in history for the restriction today adopted. In England in 1791, as of at least 1623, actions of the "force and validity" of letters patent were tried according to the rules of the common law.

Letters patent were grants of the Crown, made for a variety of purposes. During the 1500s to early 1600s, the Star Chamber considered all infringements of letters patent to be contempts of royal authority. *See Millar v. Taylor*, 4 Burr. 2303, 2374 (K.B.1769) (contempt proceeding applied by the Star Chamber to infringement of "any patent the Crown thought proper to grant"); Coke, 3 Inst. 182–83 (discussing abuses). In 1623 the Statute of Monopolies prohibited all monopolies except patents for inventions, which continued to be granted for terms that were limited to fourteen years. Section 6 of the Statute stated:

> 6. Provided also, that any declaration before mentioned, shall not extend to any letters patents and grants of privilege for the term of fourteen years or under, hereafter to be made, of the sole working or making of any manner of new manufactures within this realm to the true and first inventor and inventors of such manufactures, which others at the time of making such letters patents and grants shall not use, so as also they be not contrary to the law nor mischievous to the state by raising prices of commodities at home, or hurt of trade, or generally inconvenient ...

21 Jac. I, c. 3, s. 6 (1623).[7] Section 2 of the Statute provided that the "force and validity"

---

7. The date of the Statute of Monopolies is variously reported as 1623 or 1624 depending on

of the subject matter of the Statute shall be "examined, heard, tried, and determined" according to the common law:

> 2. And all monopolies, and all such commissions, grants, licenses, charters, letters patent, proclamations, inhibitions, restraints, warrants of assistance, and all other matters and things tending as aforesaid, and the force and validity of them, and every of them, ought to be, and shall be for ever hereafter examined, heard, tried, and determined, by and according to the common laws of this realm, and not otherwise.

21 Jac. I, c. 3, s. 2 (1623). Lord Coke explained that the purpose of Section 2 was to remedy the "mischief" of Star Chamber actions by placing the authorized grants under the common law. 3 Inst. at 183.

The litigation procedures that applied to letters patent for inventions did not differ from those applied to other letters patent. *See* Benjamin Vaughan Abbott, *Decisions on the Law of Patents for Inventions Rendered by English Courts* 8 n. 2 (1887) (the rules for letters patent stated in the case of *Rex v. Mussary* (K.B.1738) were also generally applicable to letters patent for inventions). English cases of the period show similar procedures whether the subject was a charter, an invention, a literary work, a trademark, an interest in land, or a trade route.

Trial by jury was the way of the common law, and did not depend on the subject of the letters patent. *See, e.g., East India Company versus Sandys,* 1 Vern. 127 (Ch.1682) (validity of grant of exclusive trade route

tried to jury); *Mayor of Kingston upon Hull versus Horner,* 1 Cowp. 102, 108 (K.B.1774) (dispute concerning meaning of terms of a charter from the Crown relating to a port "most proper to be left to the decision of the jury"); *Blanchard v. Hill,* 2 Atk. [2d ed. 1794] 484 (Ch.1742) (injunction to restrain the use of a tradesman's mark granted by the Crown could not be issued without a hearing at law); *Anon,* 1 Vern. 120 (Ch.1682) (the Lord Keeper (or Chancellor) required trial at law to determine the validity of letters patent for printing of the Bible); *Collins v. Sawrey,* 4 Bro.P.C. [2d ed. 1803] 692 (H.L. 1772) (rejecting argument that since the issue depended on written evidence, the "construction" of the letters patent for a vicarage was for the chancery court); *Donaldson v. Beckett,* 2 Bro. P.C. [2d ed. 1803] 129, 138 (H.L.1774) ("Between such inventions and copies of books, no sensible distinction can be drawn."); *Millar v. Taylor,* 4 Burr. at 2323:

> In letters patent, all conditions required by 21 Jac. 1 must be observed. Patentees for new inventions are left, by that statute, to the common law, and the remedies which follow in their nature.

There simply is no way, in 1995, to rewrite the history of England and the place of the jury under the common law in 1791.

Actions for infringement of letters patent for inventions were initiated either in the law courts or in Chancery, depending on the relief sought.[8] When equitable relief was sought, patent actions began with the filing of a bill in the Ordinary side of Chancery (called the Petty Bag or Latin Side), for that

---

whether the old or new English calendar is used. Edward C. Walterscheid, *The Early Evolution of the United States Patent Law: Antecedents (Part 2),* 76 J.Pat. & Trademark Off.Soc'y 849, 873 n. 98 (1994).

**8.** There were two courts in Chancery, the Ordinary court and the Extraordinary court. The Extraordinary side of Chancery was so termed because matters requiring the exercise of the King's Conscience were there addressed, for extraordinary relief. Abridgment at 127; Coke, 4 Inst. at 79. The Ordinary side of Chancery has been referred to as "common-law chancery," see *Kirker v. Owings,* 98 F. 499, 506 (6th Cir.1899), and proceeded according to the laws and statutes of England, exercising the ordinary powers of Chancery. Middle Temple, *General Abridgment*

*of Cases in Equity* 127 (1739) ("Abridgment"); Coke, 4 Inst. at 79.

The Ordinary court had the power to repeal letters patent, by plea of *scire facias.* However, if the matter "descended to issue" the court was without jurisdiction to try it to a jury, and the Chancellor would direct the issue to a court of law, where the issue would be tried to a jury, "because for that Purpose both Courts are but one." Abridgment at 128; *see* Coke, 4 Inst. at 80. After trial, with jury verdict rendered, the cause was returned to Chancery for further disposition consistent with the verdict. Abridgment at 130 ("A Cause shall not be examined upon Equity in the Court of Requests, Chancery, or other Court of Equity, after Judgment at the Common Law.")

is where the letters patent were "enrolled." Issues relating to invalidity and noninfringement, if raised by the defendant, were directed by the Chancellor to the courts of law for trial to a jury, and then returned to Chancery if the verdict warranted. The procedure of filing a bill in Chancery and then trying the issue at law was explained by Davies:

> [T]he Court of Chancery never decides upon the validity of a patent, the practice there being nothing more than to grant an injunction, at the prayer of the patentee, against any person infringing his patent, and to order an account of profits; but if any question arises upon the validity of the patent, novelty of the invention, or the sufficiency of the specification, it is uniformly referred to a court of law.

John Davies, *A Collection of the Most Important Cases Respecting Patents of Invention and the Rights of Patentees* ix (1816).

In infringement suits, the Chancery court could grant the patentee's bill seeking an injunction, or a writ of *scire facias* to repeal the patent, after trial to a jury in a court of law. *See, e.g., Brewster v. Weld,* 6 Mod. 229 (1704) (a *scire facias* to repeal letters patent may be sued in Chancery by any person prejudiced by a patent, as well as by the Crown; when Chancery issues writ returnable to Queen's Bench [requiring trial to a jury] Chancery neither has jurisdiction nor can it supersede such writ); *Rex v. Else,* 1 Carp.P.C. 103 (K.B., N.P. 1785) (proceeding brought by writ of *scire facias* to repeal patent on ground that there was no new invention described in the specification; tried in King's Bench wherein the jury rendered a verdict for the Crown). Not all matters required the Chancellor to direct issues to the law courts to be tried. For example, when the Crown granted letters patent, for invention or otherwise, the grant had to be enrolled in Chancery's Petty Bag Office within four months for the patent to be enforceable. Thus a bill could be filed in Chancery to seek equitable relief for a patentee's failure to enroll the patent before the time expired. *E.g., Ex parte Beck,* 1 Bro.P.C. [2d ed. 1803] 578 (Ch.1784).

These relationships were well established by the date of the Seventh Amendment. Issues of patent infringement and validity were tried only to a jury, in the courts of King's Bench, Common Pleas, or Assize. In a common procedure the patentee would seek an injunction against infringement, the defendant would assert invalidity, and the matter would be directed to a court of law for trial. This process is illustrated in *Newsham v. Gray,* a patent infringement action that started with a bill in equity, seeking to enjoin Gray, the alleged infringer. The Lord Keeper directed the plaintiff to bring an action at law. The following is from Lord Chancellor Hardwicke's opinion in the subsequent proceeding in Chancery, where Gray was seeking to recover costs since the plaintiff was nonsuited for failure to prosecute:

> The plaintiff had obtained letters patent of the crown for a new invention of fire engines.
>
> A bill was brought by him to establish his letters patent, and for a perpetual injunction against the defendant, who had taken upon him to make and vend these engines, notwithstanding the plaintiff had sole right and property under the letters patent.
>
> The defendant, by his answer, insisted it was not a new invention, so as to entitle the plaintiff to an injunction.
>
> There was no replication, but the cause came on at the Rolls, upon bill and answer, in *September* 1740, before Mr. Justice *Parker,* who, not thinking the answer sufficient, directed an action at law to be brought by the plaintiff, for a breach of the letters patent, and retained the bill for a twelvemonth; the plaintiff was nonsuited at law upon the merits; and the cause is now set down by the defendant for a dismission of the bill, and for costs.

2 Atk. [2d ed. 1794] 286, 286–87 (Ch.1742).

When the patentee did not seek equitable relief, the action was brought directly at law. The cause of action was trespass on the case. The action was an offspring of the criminal law, and knew no form but trial by jury. *See* H.G. Hanbury and D.C.M. Yardley, *English Courts of Law* 64 (5th ed. 1979) (1944). The defendant could assert defenses including in-

validity and noninfringement. All issues, including damages, were for the jury.

The burden of proof was on the patentee. Since letters patent of invention were issued without examination, simply upon declaration, actions to enforce the patent began with proof of entitlement to the patent, if disputed by the defendant. The burden of proving infringement was also on the plaintiff, if infringement was disputed. The English reports show that often patent infringement actions turned on the issue of entitlement or validity, whereupon when validity was found, verdict would be rendered for infringement. For example, *Dolland's Case*, 1 Carp.P.C. 28 (C.P.1766) [9] was an action for trespass on the case, seeking damages resulting from infringement of Dolland's 1758 patent on a telescope. The defendant asserted invalidity due to prior use. The jury verdict was for Dolland.

*Morris v. Bramson*, 1 Carp.P.C. 30 (K.B. 1776) was an action for infringement of Morris' patent, a patent previously tried and adjudged valid and infringed in *Morris v. Else*. (*Morris v. Else* is unreported in the English Reports; the case is discussed in *Boulton v. Bull*, 2 H.Bl. at 489.) In *Morris v. Bramson* the defendant argued that an addition to an old machine was not patentable as a matter of law. The judge instructed the jury on the law, and the jury found for the plaintiff, awarding 500 pounds in damages for infringement. 1 Carp.P.C. at 31.

*Bramah v. Hardcastle*, 1 Carp.P.C. 168 (K.B.1789), was an action in trespass on the case for infringement of letters patent for a new construct of a water closet. The defendant asserted invalidity due to prior use and lack of novelty. Lord Kenyon is reported as telling the jury "the patent was void, the invention not being new," *id.* at 171, and that they should find for the defendant.[10] The jury sustained the patent, and found infringe-

ment. The court entered judgment in accordance with the jury verdict.

*Arkwright v. Nightingale*, 1 Carp.P.C. 38 (C.P.1785), was an action for infringement of a 1775 letters patent for "machines of utility in preparing silk, cotton, flax and wool for spinning." At trial the defendant claimed that the patent was invalid because of an inadequate disclosure in the specification. At the close of the trial, Lord Loughborough provided a lengthy summary of the evidence, and concluded his charge with: "Therefore the single question is, whether you believe these five witnesses are perjured, or that they speak the truth. According as you are of the opinion, one way or the other, you will find your verdict for the plaintiff or the defendant." 1 Carp.P.C. at 53. The jury rendered a verdict for the plaintiff, that is, infringement by the defendant.

*Rex v. Arkwright*, 1 Carp.P.C. 53 (K.B. 1785): After the decision in *Arkwright v. Nightingale, supra*, a *scire facias* was filed with the High Court of Chancery to repeal the patent from the rolls, the petitioner asserting in part that the invention was not new as to use in England, and that Arkwright was not the inventor. The issue was tried to a jury in King's Bench. After the close of the evidence, the court instructed the jury:

> Gentlemen, thus the case stands as to the several component parts of this machine; and if upon them you are satisfied none of them were inventions unknown at the time this patent was granted, or that they were not invented by the defendant; upon either of these points the prosecutor is entitled to your verdict.

1 Carp.P.C. at 101. The jury found for the prosecutor.

*Turner v. Winter*, 1 T.R. 602 (K.B.1787), reports a ruling on a motion to set aside a jury verdict of patent infringement and grant

---

9. Carpmael lists the date of the decision as 1758, and Abbott, *supra*, at 9, states the date as 1766. The date of the patent grant is 1758, suggesting that Abbott may be correct. There is no official report of *Dolland's Case*, but the decision is discussed in *Boulton v. Bull*, 2 H.Bl. 463, 482–87 (K.B.1795).

10. Hanbury, *supra*, at 87–88, explains that the court was not instructing the jury on what verdict it must render. The practice was for the judge to summarize the evidence and the testimony, and frequently provide a "hint" to the jury. However, this did not diminish the authority of the jury to decide the matter.

a new trial. The court granted the motion, explaining that:

> And if it appear that there is any unnecessary ambiguity affectedly introduced into the specification, or anything which tends to mislead the public, in that case the patent is void. Here it does appear to me, that there is at least such a doubt on the evidence, that I cannot say this matter has been so fully and·fairly examined, as to preclude any further investigation of the subject.

1 T.R. at 605. The case was remanded for a new trial.

*Administrators of Calthorp v. Waymans,* 3 Keb. 710 (K.B.1676) was an action for infringement of a patent on an engine. The jury was instructed that English law required novelty only in England, and did not require that an importer/patentee of a device new to England be the actual inventor. The jury found for the patentee, the report of the case explaining that "it appeared in evidence to a jury at Bar, that the fashion came out of Holland,. and was there used above fifty years since, but never before used in England." 3 Keb. at 710.

I again stress that actions at law were tried to a jury. With respect to letters patent for inventions, and in accordance with the Statute of Monopolies, in seventeenth- and eighteenth-century England patent infringement was tried to a jury at common law. I have come upon no exception in the cases reported during this period.

## B. CONTINUITY IN THE UNITED STATES

The reports of English patent cases do not manifest the turmoil in preserving the jury right in England, the imprisonment of jurors before 1670, and attempts to limit the jury right in England as well as in the American colonies. Reflecting this experience, there was in the new United States a reverence for the place of the jury as, in the words of Thomas Jefferson, "the only anchor yet imagined by man, by which a government can be held to the principles of its constitution." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 343 n. 10, 99 S.Ct. 645, 658 n. 10, 58 L.Ed.2d 552 (1979) (Rehnquist, J., dissent-

ing) (quoting 3 *The Writings of Thomas Jefferson* 71 (Washington ed. 1861)).

The Supreme Court summarized a long history in the statement:

> The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy.

*Parsons v. Bedford,* 28 U.S. (3 Pet.) 433, 445, 7 L.Ed. 732 (1830). Justice Story made clear that the right was not limited to the precise causes of action that existed in the law courts of England. *Id.,* 28 U.S. at 446–47. *See generally* James Fleming, Jr., *Right to a Jury Trial in Civil Actions,* 72 Yale L.J. 655 (1963). In *Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) the Court wrote:

> Although the thrust of the Amendment was to preserve the right to jury trial as it existed in 1791, it has long been settled that the right extends beyond the common-law forms of action recognized at that time.

415 U.S. at 193, 94 S.Ct. at 1007. In *Tull v. United States,* 481 U.S. 412, 417, 107 S.Ct. 1831, 1835, 95 L.Ed.2d 365 (1987) the Court reiterated that the right to jury trial extends to causes of action created by Congress which are similar to common law forms of action. As a recent example, in *Chauffeurs, Teamsters, and Helpers Local No. 391 v. Terry,* 494 U.S. 558, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990), the Court considered whether a suit in which an employee sought back pay, for breach of a union's duty of fair representation, carried the right to a jury trial. The Court stated:

> To determine whether a particular action will resolve legal rights, we examine both the nature of the issues involved and the remedy sought. "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and determine whether it is legal or equitable in nature." *Tull, supra* [481 U.S.], at 417–18 [107 S.Ct. at 1835]·(citations omitted). The second inquiry is the more im-

portant in our analysis. *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 42 [109 S.Ct. 2782, 2790, 106 L.Ed.2d 26] (1989).

494 U.S. at 565, 110 S.Ct. at 1345 (footnote omitted). Observing that the cause of action of a union's duty was unknown in eighteenth-century England, the Court looked to analogous actions, including an action to set aside an arbitration award, an action of a beneficiary against a trustee, and an attorney malpractice action. *Id.* at 565–66, 110 S.Ct. at 1344–45. The Court held that the respondents were entitled to a jury trial under the Seventh Amendment, despite the equitable nature of the underlying action, since the relief sought was legal in nature. *See, e.g., Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959):

> As this Court said in *Scott v. Neely,* 140 U.S. 106, 109–110 [11 S.Ct. 712, 714, 35 L.Ed. 358 (1891) ]: "In the Federal courts this [jury] right cannot be dispensed with, except by the assent of the parties entitled to it, nor can it be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency."

359 U.S. at 510, 79 S.Ct. at 956–57 (footnote omitted). *See also Atlas Roofing Co. v. Occupational Safety and Health Review Comm'n,* 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

On this history, it is jarring to come upon the majority's argument that the Seventh Amendment no longer applies because there are now "claims" in United States patents, whereas the old English patents did not have claims as we know them. The removal of the jury right is not so casually achieved:

> [T]he Constitution is concerned, not with form, but with substance. All of vital significance in trial by jury is that issues of fact be submitted for determination with such instructions and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law.

*Gasoline Prods. Co. v. Champlin Ref. Co.,* 283 U.S. 494, 498, 51 S.Ct. 513, 514, 75 L.Ed. 1188 (1931).

However, the argument about claims does bring out a point of curiosity, for the law of eighteenth-century England required specificity in "particularly describing" what was patented, and the patent grant ended with a concise summary of the subject matter, with details annexed in the specification; patent "claims," in turn, are concise summaries of the subject matter, with details annexed in the specification. Following is a portion of a representative letters patent dated March 28, 1764:

> To all to whom these presents shall come, John Morris, of the town of Nottingham, hosier, sendeth greeting.—
>
> Whereas, the King's Most Excellent Majesty, by letters patent under the Great Seal of Great Britain, bearing the date at Westminster, [gave and granted to the inventors] sole privilege ... to make, use, exercise, and vend their invention ... in which said letters patent is contained a proviso that if the said Thomas and John Morris, and John and William Betts, or any one of them should not *particularly describe the nature of the said invention and in what manner the same is to be performed* by an instrument, in writing under their hands and seals, or the hand and seal of one of them, and cause the same to be enrolled in the High Court of Chancery ...
>
> [The specification ending with:] Now know ye, that I, the said John Morris, in pursuance of the said proviso in the said letters patent contained, do hereby declare that the said invention of an engine or machine, on which is fixed a set of working needles, which engine or machine is fixed to a stocking-frame for the making of oilet-holes or net-work in silk, thread, cotton, or worsted, as mitts, gloves, hoods, aprons, handkerchiefs, and other goods usually manufactured upon stocking-frames by a method entirely new, is particularly described in the plans hereunderto annexed.

*Morris v. Bramson,* 1 Carp. P.C. at 31–32 n. * (emphasis added). The requirement that the inventor "particularly describe" the invention was carried into the United States Patent Act of 1790:

Sec. 2. *And be it further enacted,* That the grantee or grantees of each patent shall, at the time of granting the same, deliver to the Secretary of State a specification in writing, containing a description, accompanied with drafts or models, and explanations and models (if the nature of the invention or discovery will admit of a model) of the thing or things, by him or them invented or discovered, and described as aforesaid, in the said patents; *which specification shall be so particular, and said models so exact, as not only to distinguish the invention* or discovery from other things before known and used, but also to enable a workman or other person skilled in the art or manufacture, whereof it is a branch, or wherewith it may be nearest connected, to make, construct, or use the same....

Patent Act of 1790, ch. 7, § 2, 1 Stat. 109, 110 (1790) (emphasis added).

This requirement was continued in all subsequent revisions, which were successively more explicit. In 1836 the Patent Act required that the inventor "particularly specify the part, improvement, or combination which he claims as his own invention." Ch. 357, § 6, 5 Stat. 117, 119. Again revised in 1870, the statute required that the inventor "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." Ch. 230, § 26, 16 Stat. 198, 201. The present statute, enacted in 1952, states that "the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. This evolution in statutory directive, requiring the inventor to be more specific as to what had been invented, did not remove the jury from trial of patent infringement cases.

The majority's other response to the Constitution is to call a patent a "statute," arguing that "statutory interpretation" is not for the jury. Designating a patent a statute in order to avoid the Seventh Amendment simply denies history and our heritage. Our judicial responsibility is to uphold the Constitution, not devise ways to circumvent it.

## IV

## PRECEDENT

### A. FEDERAL CIRCUIT CASES SELECTED FOR CRITICISM AND OVERRULE

The Federal Circuit early in its existence deplored the "risk of effectively denying the constitutional right spelled out in the first clause of the Seventh Amendment." *Railroad Dynamics v. Stucki,* 727 F.2d at 1515, 220 USPQ at 937–38. Many Federal Circuit decisions implemented the correct standard of trial and appellate review in patent infringement cases. The majority now expressly disapproves appellate deference to the trier of fact on the issues of fact that are determined in the course of "construing" the meaning and scope of patent claims, issues of fact that are dispositive of the question of patent infringement. The majority singles out seven cases for specific criticism, and fatally taints the many other cases that applied the correct standard of deference to the trier of fact.

The majority explains that it overrules these cases because this court held that the interpretation of disputed technologic terms in patent claims raises jury-triable issues, or because the panel applied a deferential standard of appellate review. Majority op. at 993–994. The majority does not tell us how such cases will be tried, now that appeal includes mandatory *de novo* adjudication of what were once recognized as triable facts. Even the least cynical observer must wonder at the court's capacity for this technological overload. A glance at the subject matter of the seven expressly disapproved cases illustrates these problems.

1. ***McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 221 USPQ 944 (Fed.Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984).**

The disputed technical term in the patent claim was "recovered liquid hydrocarbon absorbent." On McGill's view of what this term meant, the Zink process would infringe McGill's claim; on Zink's view, the Zink pro-

cess would not infringe. There was conflicting testimony of technical experts, and the issue was submitted to the jury. On appeal the Federal Circuit made the now-excoriated statement:

> If, however, the meaning of a term of art in the claims is disputed and extrinsic evidence is needed to explain the meaning, construction of the claims could be left to the jury. In the latter instance, the jury cannot be directed to the disputed meaning for the term of art.

*Id.* at 672, 221 USPQ at 948 (citations omitted). On appellate review the court considered the meaning of the claims upon the following criterion:

> In the instant case, the jury's finding of infringement was predicated on construction of claim 2. To obtain a reversal, Zink must demonstrate that no reasonable juror could have interpreted the claim in the fashion that supports the infringement finding.... Zink must convince us that there is no set of facts, consistent with McGill's interpretation, that was supported by substantial evidence.

*Id.* The majority now holds that the meaning of "recovered liquid hydrocarbon absorbent" and the other disputed technical terms that were at issue was not a jury triable issue, and that the Federal Circuit should have, and hereafter will, decide such questions as a matter of law.

**2. *Bio–Rad Labs., Inc. v. Nicolet Instrument Corp.*, 739 F.2d 604, 222 USPQ 654 (Fed.Cir.), *cert. denied*, 469 U.S. 1038, 105 S.Ct. 516, 83 L.Ed.2d 405 (1984).**

The patented device was an interferometer that contained an oscillating mirror that varied the lengths of two of four possible paths of split beams of reflected light, whereby the thickness of the epitaxial layer of a semiconductor was determined from the points of locally maximum constructive interference, by comparing phase differences. The jury trial lasted forty-four days. On appeal this court stated that we review to determine

> whether reasonable jurors, after reviewing all the evidence, could have interpreted the claims to include the sequence of events followed by [the accused optical apparatus].

*Id.* at 613, 222 USPQ at 661 (citing *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893, 221 USPQ 669, 673 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)). This court declined the losing party's request that we make a *de novo* interpretation of the claims:

> We emphasize that our task is not to interpret the claims as though no trial occurred. Both parties submitted testimony in support of their interpretation before the jury. Bio–Rad's interpretation prevailed and was not overturned by the trial judge. On appeal, we consider only whether reasonable jurors could have interpreted the claim in the manner presumed.

*Id.* at 614, 222 USPQ at 661–62. This practice can no longer be followed, and the Federal Circuit shall somehow conduct these technological analyses for ourselves, as a matter of law.

**3. *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 226 USPQ 5 (Fed.Cir.1985).**

This case too is criticized for its holding that the findings of disputed facts of the meaning of claim terms is for the trier of fact. The appeal reached us on summary judgment. Palumbo sued Don–Joy for infringement of a patent to a patellar brace used in diagnosis and treatment of patellar subluxation (dislocation of the kneecap). In holding that summary judgment was improperly granted, this court referred to the disputed factual issues that had been raised in the depositions, as well as ambiguity in the prosecution history and the need for expert witnesses to present the viewpoint of those of skill in this art. The court stated:

> If the language of a claim is not disputed, then the scope of the claim may be construed as a matter of law. But when the meaning of a term in a claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises, and construction of the claim should be left to the trier or jury under appropriate instruction.

*Id.* at 974, 226 USPQ at 8. Overruling the statement that the meaning of claim terms

can raise underlying factual questions and that disputed "claim construction" should be left to the trier or jury, the majority now requires that the Federal Circuit shall make these decisions *de novo*.

**4. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 229 USPQ 992 (Fed.Cir.1986).**

As I mentioned *supra*, the majority also disapproves this case, criticizing its holding that "disputes over the meaning of claim language may raise factual questions reviewed for substantial evidence or clear error as the case may be," in the majority's words. The invention was a system of selectively measuring the concentration of certain cations in the presence of other components, by interposing a membrane barrier and using specified electrodes whereby cation-specific components such as nonactin, gramicidin, and valinomycin form positively charged complexes with the sensing device. The disputed term claims were "electrode," "electrode body," and "disposed in said body." The technologic meaning of these terms, in this usage and this invention, decided whether the terms encompassed the accused system. On appeal this court observed that the meanings of these terms were "clearly disputed," referring to conflicting evidence, and held that the matter required trial, vacating the grant of summary judgment. It appears that this court will now decide what these terms mean as a matter of law.

**5. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 2 USPQ2d 1926 (Fed.Cir.1987).**

In connection with a motion for preliminary injunction, the dispositive issue before the district court was the meaning of "bottomless trench" in a patent for a concrete deck structure for distributing electrical wiring. The defendants argued that their structure was not "truly bottomless" because "horizontal metal sections" and a "horizontal metal strip" constituted a partial bottom. After a four-day hearing, the district court granted the preliminary injunction. In affirming, this court described its standard of review:

> Claim construction is reviewed as a matter of law. However, interpretation of a claim may depend on evidentiary material about which there is a factual dispute, requiring resolution of factual issues as a basis for interpretation of the claim. In this case, there was extensive testimony on the issue of claim construction, including the conflicting views of experts on both legal and factual questions. Those factual considerations that are pertinent to the district court's construction of the term "bottomless" are reviewed under the clearly erroneous standard.

*Id.* at 389, 2 USPQ2d at 1929 (citations omitted). The majority condemns this case for its recognition that "claim construction" may require resolution of factual issues, and the use of the clearly erroneous standard of review for those factual findings. Not only juries, but trial judges, will now be denied the deference owed to their factual findings.

**6. *Perini America, Inc. v. Paper Converting Mach. Co.*, 832 F.2d 581, 4 USPQ2d 1621 (Fed.Cir.1987).**

This too was a bench trial, and had been fully tried to the court. As I mentioned *supra*, the dispute related to various aspects of machines used in manufacturing paper towels. This court recognized that these were factual issues, reviewed on the clearly erroneous standard:

> A trial court's conclusions on the scope of the claims are reviewable as matters of law, but findings on disputed meanings of terms in the claims and on the infringement issue must be shown to have been clearly erroneous.

*Id.* at 584, 4 USPQ2d at 1624 (citations omitted). The court observed that "legal conclusions [are] dictated by established facts and not the other way around, and does not change the nature of the meaning-of-terms inquiry from one of fact to one of law." *Id.* The majority strongly criticizes, and overrules, these statements.

**7. *Tol–O–Matic, Inc. v. Proma Produkt–Und Marketing Gesellschaft m.b.H,* 945 F.2d 1546, 20 USPQ2d 1332 (Fed.Cir. 1991).**

This was a jury trial. The technology related to rodless piston-cylinders. The in-

vention was for a yoke structure that reduces the forces tending to widen the slit through which the external load is moved by the piston, thereby avoiding loss of cylinder pressure. At issue was the meaning of the term "to provide for lateral support of the portions of the cylinder separated by the slit and spanned by the yoke." The decision required a choice between Tol–O–Matic's position that this term meant that the yoke must prevent all widening of the slit, and Proma's position that this term required only some resistance to slit widening. At the trial there was testimony by engineers representing both sides, who ran tests on rodless cylinders under various conditions and reached inconsistent results. The jury was instructed to consider all of the evidence and find the meaning of the disputed term, and then to apply it to the accused device. On appeal this court endorsed the procedure:

> The interpretation of claims is defined as a matter of law based on underlying facts. Interpretation of the claim words "provide for lateral support" *required that the jury give consideration and weight to several underlying factual questions*, including in this case the description of the claimed element in the specification, the intended meaning and usage of the claim terms by the patentee, what transpired during the prosecution of the patent application, and the technological evidence offered by the expert witnesses. *When the meaning of a term in a patent claim is unclear, subject to varying interpretations, or ambiguous, the jury may interpret the term en route to deciding the issue of infringement.* The jury's verdict of noninfringement is reviewed, in accordance with the rules governing review of jury determinations, to ascertain whether reasonable jurors could have interpreted the claim in a way that supports the verdict.

*Id.* at 1549–50, 20 USPQ2d at 1335–36 (emphases added) (citations omitted).

This case is severely criticized for the emphasized statements. According to the majority these questions are not factual, can not be given to the jury, are not reviewed with deference to the trier of fact, and will be decided *de novo* by the Federal Circuit.

### B. OTHER IMPUGNED FEDERAL CIRCUIT CASES

The court in *Tol–O–Matic* cited *Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 4 USPQ2d 1450 (Fed.Cir.1987); *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 4 USPQ2d 1283 (Fed.Cir.1987); *Howes v. Medical Components, Inc.; Moeller v. Ionetics, Inc.; Snellman v. Ricoh Co., Ltd.*, 862 F.2d 283, 8 USPQ2d 1996 (Fed.Cir. 1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3199, 105 L.Ed.2d 707 (1989); *Vieau v. Japax, Inc.*, 823 F.2d 1510, 3 USPQ2d 1094 (Fed.Cir.1987); *Data Line Corp. v. Micro Technologies, Inc.*, 813 F.2d 1196, 1 USPQ2d 2052 (Fed.Cir.1987); *Palumbo v. Don–Joy Co.; Bio–Rad Labs., Inc. v. Nicolet Instrument Corp.; Perkin–Elmer Corp. v. Computervision Corp.*; and *McGill, Inc. v. John Zink Co.*. Only some of these decisions are today singled out for criticism; but all explicitly recognized the now-rejected difference between fact and law as applied to the meaning of disputed terms in patent claims, and all deferred, on appellate review, to the findings of the trier of fact.

For example, *Data Line v. Micro Technologies* related to computer technology wherein the jury, hearing expert testimony, interpreted "means for sensing the presence or absence of output data"; this court on appeal rejected the appellant's argument that the trial court should have "determine[d] the scope and construction of claim 1," and instead gave deferential review to the jury verdict. In *Snellman v. Ricoh* the jury verdict was reviewed on the substantial evidence standard, not *de novo*. In *Delta–X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 415, 25 USPQ2d 1447, 1450 (Fed. Cir.1993), this court approved the trial procedure whereby "because of disputes over claim terms, the judge instead left resolution of these disputes to the jury."

There are many more cases than those I have listed, in which the jury decided technological and other factual disputes concerning the meaning and scope of terms of patent claims, thereby also deciding the fact of infringement, and where the jury verdict was reviewed on the usual substantial evi-

dence/reasonable jury standard. There are many more cases than those I have listed, in which the district court at bench trial found the facts of what the claim terms mean and cover, and on appellate review this court applied the clearly erroneous standard of review. These procedures, which are in accord with factual determinations in other areas of litigation, have now been rejected. The new and unique treatment of disputed facts in patent cases does not appear to offer advantages to outweigh its disadvantages.[11]

## C. THE MAJORITY'S CITED AUTHORITY

The authority on which the majority relies simply does not support its statement that "the Supreme Court has repeatedly held that construction of a patent claim is a matter of law exclusively for the court." Majority op. at 994. That statement is of course correct when deciding the legal effect of a patent claim, and when stating the law to be applied by the trier of fact in interpreting disputed terms. However, it is not correct with respect to findings of disputed factual issues, issues that usually relate to the meaning and scope of the technologic terms and words of technical art that define the invention. Even the majority's selected authority recognized that such issues are factual, to be found by the jury. Although the majority now equates these factual findings with "construction of a patent," the Supreme Court did not.

In *Winans v. Denmead,* 56 U.S. (15 How.) 330, 14 L.Ed. 717 (1854) the invention was the conical shape of a coal-carrying railroad car, whereby the car could carry several times its weight in coal. The car described and claimed in Winans' patent had a circular cross-section; the accused car of Denmead had an octagonal cross-section. The trial court instructed the jury that since the patent described the circular shape, it was so limited. The Supreme Court held that the instruction was in error, and that the jury

should have been instructed on the legal rule that the thing patented was not limited to the exact shape or form illustrated, but depended on whether the same function was performed in substantially the same way and with the same result—the rule now called the "doctrine of equivalents."

As the majority states, the Court indeed "construed" the "thing patented." 56 U.S. at 338. The "construction" was the legal rule that the claim could be infringed by an equivalent structure. Having corrected this error of law in the jury instructions, the Court did not then answer the factual question for itself, as now does the Federal Circuit. The Court remanded for retrial to the jury, on the correct instruction of law:

> Whether, in point of fact, the defendant's cars did copy the plaintiff's invention, in the sense above explained, is a question for the jury, and the court below erred in not leaving that question to them upon the evidence in the case, which tended to prove the affirmative.

56 U.S. at 344.

In *Silsby v. Foote,* 55 U.S. (14 How.) 218, 14 L.Ed. 391 (1853), also relied on by the majority, the Court again did not remove factual issues from the jury. The Court construed the patent claim as a combination claim, and stated that the trial judge correctly instructed the jury on the law that all of the necessary parts of the claimed combination must be present in an infringing device. These were indeed matters of law. The Court stated that the trial judge properly left to the jury the question of which parts of the claimed device were necessary to its operation (which was to regulate the heat of a stove by automatically varying the position of the damper in response to temperature changes), as well as whether the defendants used these necessary parts.

The defendants had argued that the trial judge had impermissibly left a question of

---

11. Although some *amici curiae* encouraged the Federal Circuit to find technological facts for ourselves, none explained the procedure by which we are to do so. Are we to read the entire record of the trial, re-create the demonstrations, decipher the literature of the science and art; are we to seek our own expert advice; must the parties be told the technical training of our law clerks and staff attorneys? No *amicus* explained how improved technological correctness—that is, truth—would be more likely to be achieved during the appellate process of page-limited briefs and fifteen minutes per side of argument.

law to the jury. The Court pointed out that the question of which parts were necessary to regulate the heat of the stove was not a matter of law, but a question of fact to be decided by the jury:

> The substance of the charge is, that the jury were instructed by the Judge, that the third claim in the specification was for a combination of such parts of the described mechanism as were necessary to regulate the heat of the stove; that the defendants had not infringed the patent, unless they had used all the parts embraced in the plaintiff's combination; and he left it to the jury to find what those parts were, and whether the defendants had used them.
>
> We think this instruction was correct. The objection made to it is, that the court left to the jury what was matter of law. But an examination of this third claim, and of the defendants' prayers for instruction, will show that the Judge left nothing but matter of fact to the jury. The construction of the claim was undoubtedly for the court. The court rightly construed it to be a claim for a combination of such of the described parts as were combined and arranged for the purpose of producing a particular effect, viz., to regulate the heat of a stove.
>
> . . . .
>
> . . . . But the defendants also desired the Judge to instruct the jury that the index, the detaching process, and the pendulum, were constituent parts of this combination. How could the Judge know this as matter of law?

*Id.* 55 U.S. at 225–26. The Court affirmed that the factual question of what the claim covered was for the jury to decide, in the course of determining the question of infringement. Indeed, the Court's query was pointed: "How could the Judge know this as a matter of law?" *Id.* at 226.

In *Coupe v. Royer*, 155 U.S. 565, 15 S.Ct. 199, 39 L.Ed. 263 (1895) the Court held that there was legal error in the trial judge's description of the invention to the jury, and in the withdrawal of the question of infringement from the jury. The Court held that the trial judge had omitted a limitation contained in the claims of the patent (*viz.*, that the

orientation of the machine was vertical). It was indeed legal error to omit a claim limitation, then as now, and the Court, correcting this error, remanded for a new trial to the jury. The Court declined to give a peremptory instruction to the jury, stating that all of the differences are "the subject of legitimate consideration by the jury":

> [T]he question of infringement, arising upon a comparison of the Royer patent and the machine used by the defendants, should be submitted to the jury, with proper instructions as to the nature and scope of the plaintiffs' patent as hereinbefore defined, and as to the character of the defendants' machine.

155 U.S. at 579–80, 15 S.Ct. at 205. This case again illustrates the Court's role as assuring that the law is correctly stated to the jury, and the jury's role as trier of fact. Again, a case relied on by the majority does not support the majority's position.

In *Bischoff v. Wethered*, 76 U.S. (9 Wall.) 812, 19 L.Ed. 829 (1870) the Court distinguished between the construction of the patent as a legal instrument, and the factual nature of the thing invented:

> It is not the construction of the instrument, but the character of the thing invented, which is sought in questions of identity and diversity of inventions.

76 U.S. at 816. The issue was identity of invention, and the Court reiterated that the meaning of disputed terms of art is "a question of fact for the jury." *Id.* at 814. The majority includes *Bischoff* as authority for its removal of these findings of fact from the jury. That is a curious reading of the holding in *Bischoff*:

> A case may sometimes be so clear that the court may feel no need of an expert to explain the terms of art or the descriptions contained in the respective patents, and may, therefore, feel authorized to leave the question of identity to the jury, under such general instructions as the nature of the documents seems to require. And in such plain cases the court would probably feel authorized to set aside a verdict unsatisfactory to itself, as against the weight of the evidence. But in all such cases *the ques-*

*tion would still be treated as a question of fact for the jury, and not as a question of law for the court.* And under this rule of practice, counsel would not have the right to require the court, as a matter of law, to pronounce upon the identity or diversity of the several inventions described in the patents produced.

*Id.* (emphasis added). Indeed, only two years later the Court again considered the issue, and in *Tucker v. Spalding,* 80 U.S. (13 Wall.) 453, 20 L.Ed. 515 (1872) the Court held that a prior patent and related expert testimony on the issue of "diversity or identity" were improperly withheld from the jury, describing the issue as a "mixed question of law and fact," and stating:

> Whatever may be our personal opinions of the fitness of the jury as a tribunal to determine the diversity or identity in principle of mechanical instruments, it cannot be questioned that when the plaintiff, in the exercise of the option which the law gives him, brings his suit in the law in preference to the equity side of the court, that question must be submitted to the jury, if there is so much resemblance as raises the question at all. And though the principles by which the question must be decided may be very largely propositions of law, it still remains the essential nature of the jury trial that while the court may on this mixed question of law and fact, lay down to the jury the law which should govern them, so as to guide them to truth, and guard them against error, and may, if they disregard instructions, set aside their verdict, the ultimate response to the question must come from the jury.

80 U.S. at 455.

In *Winans v. New York and Erie R. Co.,* 62 U.S. (21 How.) 88, 16 L.Ed. 68 (1859) infringement was conceded, and the issue at trial was "originality." The Court stated that the trial judge "has given the only construction which the language of this specification will admit," *id.,* 62 U.S. at 101, in explaining to the jury that the invention was in the manner of arranging the wheels and the car body. Having explained the invention to the jury, the question of originality was held to be for the jury, not the court.

In discussing the appropriate use of expert witnesses, the *Winans* Court stated that "professors or mechanics" can not prove "legal construction of any instrument of writing," but may testify on matters of art or science:

> Experts may be examined to explain terms of art, and the state of the art, at any given time. They may explain to the court and jury the machines, models, or drawings, exhibited. They may point out the difference or identity of the mechanical devices involved in their construction. The maxim of "unique in sua arte credendum" permits them to be examined to questions of art or science peculiar to their trade or profession; but professors or mechanics cannot be received to prove to the court or jury what is the proper or legal construction of any instrument of writing.

62 U.S. at 100–01. On this aspect, too, the case does not stand for the removal of factual findings from the jury; indeed the Court recognized the various kinds of evidentiary facts on which technical experts routinely testify in patent cases.

In *Heald v. Rice,* 104 U.S. 737, 26 L.Ed. 910 (1882) the Court stated that when there was no dispute about the technology, no need for evidence, and no question of fact requiring resolution by a jury, the "mere comparison" of a reissue and original patent was a matter of law for the court. Other cases related to a directed verdict when no fact was in dispute, *e.g., Singer Mfg. Co. v. Cramer,* 192 U.S. 265, 24 S.Ct. 291, 48 L.Ed. 437 (1904) (the trial court should have granted a directed verdict when there was no dispute as to the meaning of any term of art and no substantial evidence of infringement); or the grant of a new trial, *e.g., Market St. Cable Ry. Co. v. Rowley,* 155 U.S. 621, 15 S.Ct. 224, 39 L.Ed. 284 (1895) (since the facts were not disputed and no extrinsic evidence was given or needed, the court should have instructed the jury on lack of patentable novelty; the Court remanded with directions to set aside the verdict and grant a new trial). The new trial and the directed verdict are modes of judicial management of the trial process, and quite different from the majority's decision simply to eliminate the jury.

*Hogg v. Emerson,* 47 U.S. (6 How.) 437, 12 L.Ed. 505 (1848), another case relied on by the majority, was part of a lengthy litigation. There was a jury trial, review by a circuit panel, retrial to a jury, and two appeals to the Court. In this appeal the Court considered which documents were properly considered when "construing" the patent, in view of the fire that destroyed the Patent Office files in 1836. In reviewing the question of whether the patent in suit covered the entire steam engine or only the improvement, the Court "construed" the patent as covering only the improvement. *Id.,* 47 U.S. at 484. The Court affirmed the trial court, which the report states "left the question of fact as to reasonable diligence of the patentee or not in this respect, and also all questions of fact involved in the points of the case for the defendants, to the jury." *Id.* at 445.

The majority also relies on *Levy v. Gadsby,* 7 U.S. (3 Cranch) 180, 2 L.Ed. 404 (1805), wherein the Court ruled that a certain document was a contract and not some other form of transaction, and was subject to the usury law. This was legal construction of a document, and was decided by the Court. This case says nothing about removing disputed factual questions from the jury. The majority also cites *Eddy v. Prudence Bonds Corp.,* 165 F.2d 157, 163 (2d Cir.1947), *cert. denied,* 333 U.S. 845, 68 S.Ct. 664, 92 L.Ed. 1128 (1948), wherein the court, reviewing the legal operation of a court-approved Supplemental Trust Agreement in bankruptcy in view of a court' order, stated that "appellate courts have untrammeled power to interpret written documents." This determination of legal effect is indeed "construction" of a legal document.

I shall not dwell on the majority's reliance on other cases that were bills of equity and tried to the court, for they do not raise the issue of the jury right. *See Loom Co. v. Higgins,* 105 U.S. 580, 26 L.Ed. 1177 (1881) (determining if patentee was the true inventor, and whether patent claim was sufficiently described in the specification); *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 26 L.Ed. 149 (1880) (limiting Goodyear's claims to dentures manufactured by vulcanization); *Bates v. Coe,* 98 U.S. 31, 25 L.Ed. 68 (1878) (determining which elements constituted the invention and which constituted equivalents); *Merrill v. Yeomans,* 94 U.S. 568, 24 L.Ed. 235 (1876) (construing patent claim in light of specification as only for process of manufacture); and *Seymour v. Osborne,* 78 U.S. (11 Wall.) 516, 546, 20 L.Ed. 33 (1871) (discussing "scientific witnesses to aid the court in coming to a correct conclusion"). The majority cites *Merrill v. Yeomans* as "applying 'well-settled rules of construing all instruments.'" The rule the Court applies at this quotation is that words and phrases are to be construed so as to give them meaning. 94 U.S. at 571. This is indeed a rule of law; the Court did not convert findings of fact into rules of law. Nor should it be necessary to point out that when cases are tried "to the court," majority op. at 996–997, the resolution of disputes as to what claim terms mean is indeed "for the court."

*Exhibit Supply Co. v. Ace Patents Corp.,* 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, 52 USPQ 275 (1942), also cited by the majority, turned on prosecution history estoppel resulting from an amendment to the claims in the Patent Office. The Court stated the rule of law that "what the patentee, by a strict construction of the claim, has disclaimed ... cannot now be regained by recourse to the doctrine of equivalents, which at most operates, by liberal construction." There was no dispute as to the meaning of technical terms, and the Court applied this rule of law to the undisputed facts. This had been a bench trial, on bill of equity. *Ace Patents Corp. v. Exhibit Supply Co.,* 119 F.2d 349, 48 USPQ 667 (7th Cir.1941). It is difficult to discern the relevance of this case to the issues in *Markman.*

Many dozens of patent cases reached the Supreme Court. Some of those relied on by the majority as support for trial to the court were bills in equity. Of those in law, most were tried to a jury. It is not possible to diminish the great weight of precedent wherein patent infringement was tried to a jury, the jury deciding disputed factual questions of what the patent covered, and applying these findings to the accused device. The court today effects a dramatic realign-

ment of jury, judge, and the appellate process.

## D. THE SPECIAL RESPONSIBILITY OF THE FEDERAL CIRCUIT

The Federal Circuit is responsible for establishing consistent national law in its areas of assigned subject matter. The court early in its existence took note that patent cases were only one of many areas of commercial dispute, only one of many areas of intellectual property dispute, that are tried in the district courts. We have striven to assure that unnecessary burdens are not placed upon the district courts of the nation by virtue of the separate path of appellate review of patent cases. We acted to assure that the same procedures would apply in the trial of patent cases as in other civil actions. *See, e.g., Allen Organ Co. v. Kimball Int'l, Inc.,* 839 F.2d 1556, 1563, 5 USPQ2d 1769, 1774 (Fed.Cir.) (for matters not unique to patent law the procedural law of the regional circuit applies in patent trials), *cert. denied,* 488 U.S. 850, 109 S.Ct. 132, 102 L.Ed.2d 104 (1988). Thus the litigation process that served other civil disputes also served in patent litigation. Today's ruling, with its departures from the rules of evidence, its changed standards of deference and review, its conflict with established jury and bench procedures, challenges the principle on which this comity was based.

Patent cases are not unique in their usage of specialized terms and words of art, in their reliance on technologic or scientific evidence, in their dependence on findings of technologic fact. Evidentiary conflicts with respect to technology and science arise in a variety of cases; and the conflicting testimony of expert witnesses is ubiquitous. Trial judges have extensive experience in assuring a fair trial, and finding, within human limitations, the truth.[12] Today this court severs patent cases from all others, requiring different (and uncertain) procedures at trial, taking unto ourselves a different, and uncertain, appellate role.

It is the responsibility of the appellate court to assure that the law is correctly stated. The rules of patent law include an ever-enlarging body of nuance and clarification, flowing from twelve years of Federal Circuit jurisprudence and the rich history on which we have built. This court has undertaken the fine-tuning of the law, appropriate to the importance of technology in today's world. Much of this fine-tuning relates to new fields of science and technology (computers, biotechnology, materials); but it also relates to traditional concepts of patent law as applied to modern technologic and commercial needs.

The appellate role is to apply these principles in wise implementation of the policy of the law, as litigants probe the grey areas that test *conflicting policy considerations.* The appeal is not designed for *de novo* finding of the facts. I doubt the practical feasibility of the majority's holding that this court will "construe" the meaning of technical terms and words of art without benefit of the trial experience. It is of course appropriate for this court to be alert to methodologies of resolution of disputes that involve science and technology. The trial of scientific/technologic disputes was explored, for example, in the Report of the Carnegie Commission, *Science and Technology in Judicial Decision Making* (1993); the Report of the Brookings Institution, *Charting a Future for the Civil Jury System* (1992); and in ongoing studies and Reports of the Federal Judicial Center. However, in this complexity of problems and solutions, it is an illusion to think that patent litigation difficulties can be resolved by turning factual issues into matters of law and assigning them to the Federal Circuit.

The deference that appellate courts must give to the trial process is fundamental to the

---

12. Many aids to the trial process are at hand when the issues are scientific and technologic. The *Manual for Complex Litigation, Second* (1985) points out the utility of special verdicts and interrogatories, *see* § 21.633, and that Fed. R.Evid. 706 is particularly useful when experts have divergent opinions, *see* § 21.51. Important studies have been made, see the Federal Judicial Center's *Reference Manual of Scientific Evidence* (1994). No study that I have seen or heard of proposes simply to turn complex factual determinations of technical issues over to the appellate court. To replace the trier of fact with the Federal Circuit is as unfriendly to the search for truth, as it is unworkable.

efficiency, and the effectiveness, of the judicial system. It implements the two-tier litigation right, and provides stability to the trial process while preserving appellate authority for the law, its policy and its purposes. The court's decision today denies the critical values of the trial, and moves the Federal Circuit firmly out of the juridical mainstream.

## V

### THE MERITS

Both sides testified on the meaning and scope of the term "inventory," as used by Markman and in light of the Westview system. The issue was whether "inventory" meant only clothing, or could reach the invoices of the Westview system. Markman presented four witnesses. Westview presented one witness. After the jury verdict in favor of Markman the district court, applying recent Federal Circuit panel opinions that required *de novo* determination of the issue (foreshadowing today's *en banc* holding), reviewed the evidence independently and decided in favor of Westview. The district court did not discuss the jury verdict, or state whether there was evidentiary support for the jury verdict.

The district court did not apply the proper standard on post-trial motions, *viz.* whether there was substantial credible evidence of such quality and weight that a reasonable jury could have reached the verdict that was reached by this jury. It is for the trial judge to decide, in the first instance, whether the jury verdict can stand, or whether the judgment should have been directed, or whether a new trial should be granted. I would remand for redetermination on the correct standard.